**Sandra K. MANN, Plaintiff,**

v.

**Anthony M. FRANK, Postmaster General, Defendant.**

**No. 90–1122–CV–W–5–BC.**

United States District Court, W.D. Missouri, W.D.

June 10, 1992.

William Nulton, Shughart, Thomson & Kilroy, Kansas City, Mo., for plaintiff.

Jerry Short, Asst. U.S. Atty., Kansas City, Mo., for defendant.

## JUDGMENT ORDER

LARSEN, United States Magistrate Judge.

Plaintiff Sandra K. Mann, an employee of the United States Postal Service ("Postal Service"), filed a complaint against the Postal Service alleging that the Postal Service discriminated against her on the basis of religion. Plaintiff's claim of religious discrimination is based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16. Specifically, plaintiff claims that the Postal Service discriminated against her when it "conditioned her status on the Overtime Desired List ... upon her agreement to work on her sabbath" and this alleged condition resulted in the removal of her name from the Overtime Desired list on or about November 18, 1985.

I find by a preponderance of the evidence that the Postal Service provided a reasonable accommodation to plaintiff's religious needs, which is all that is required under Title VII. Furthermore, although the Postal Service is not required to further show that each of the employee's alternative accommodations would result in undue hardship, I find that each of the suggested accommodations would indeed result in undue hardship to the Postal Service.

Therefore, judgment is entered in favor of defendant.

## I. FACTS

A. *Background*

Plaintiff became a member of the Seventh Day Adventist Church on August 25, 1979. She began employment with the U.S. Postal Service on September 22, 1980, as a part-time flexible Multiposition Letter Sorting Machine ("MPLSM") Clerk. Soon thereafter, plaintiff wrote a letter to the Postal Service stating that the tenets of her church required that she refrain from secular labor on her Sabbath, which runs from sundown Friday until sundown Saturday. This was accompanied by a letter from the President of her congregation certifying that plaintiff's religious beliefs required her to refrain from any secular labor on her Sabbath.

Plaintiff was initially scheduled to work Friday through Tuesday, but the Postal Service granted her request to have Fridays and Saturdays off as an accommodation to her religious beliefs.

In late 1981, plaintiff transferred to pay section 215 where her scheduled work days were Wednesday through Sunday. Plaintiff used annual leave or the Postal Service granted her change of scheduling requests so that she would not have to work on her Sabbath. In April 1984, the Postal Service informed plaintiff that because other employees complained that she was receiving preferential treatment, it would no longer honor her requests for temporary schedule changes. Plaintiff filed an EEO complaint, which was resolved in her favor on July 21, 1988. Relying on *Trans World Airlines, Inc., v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), the EEOC held that the Postal Service failed to demonstrate undue hardship by allowing plaintiff to make use of temporary schedule changes, even if indefinite, since the Postal Service had not shown that it assigned

other employees to carry out the plaintiff's duties, or otherwise incurred staff shortages, increased workloads or overtime expenses. See P.Ex. 2.

While in pay section 215, plaintiff worked the primary sort on an MPLSM machine sorting letters by zip code. During that time there were between 22 and 40 employees assigned to pay section 215. The work performed in pay section 215 was interchangeable with that performed by pay section 216 because it involved similar skills in its primary sort. Therefore, the total number of available employees to perform overtime was substantial.

In November 1985, Article 8, Section 5.A of the collective bargaining agreement stated that "[t]wo weeks prior to the start of each calendar quarter, full-time regular employees desiring to work overtime during that quarter shall place their names on an 'Overtime Desired' list." See P.Ex. 5. There was no requirement that employees sign the Overtime Desired list, and employees were not disciplined for not signing the list. See Court's Ex. 2, p. 232.

During most of plaintiff's employment in pay section 215, she voluntarily placed her name on the Overtime Desired list. Every time plaintiff was called to work overtime on her Sabbath while in pay section 215, the Postal Service excused her by arranging for another employee on the Overtime Desired list from pay section 215 or 216 to work in her place. This occurred at least five times.

## B. *Transfer to Pay Section 218*

In September 1985, plaintiff bid successfully on a transfer to pay section 218, in which all the clerks memorized a scheme for a secondary sort. Plaintiff's scheme was General Post Office (GPO) Scheme 8, in which the MPLSM clerks pressed keys to sort letters within zip code 64108 according to the addresses.

Employees who operated the MPLSM machines normally worked for 30 minutes, then spent 15 minutes collecting mail and loading it into the machine for the next round of sorting. However, in emergencies, employees had been forced to key the

machine for 45 minutes before the 15 minute collecting/loading break. This practice was not authorized by the collective bargaining agreement and often resulted in grievances being filed against the Postal Service.

The overtime provisions of the collective bargaining agreement stated that employees desiring to work overtime shall place their names on an Overtime Desired list. When the need for overtime arose, employees with the necessary skills having listed their names were selected in order of their seniority on a rotating basis. The agreement further provided that employees not on the Overtime Desired list may be required to work overtime only if all available employees on the Overtime Desired list had been utilized. See P.Ex. 5, Article 8, Section 5.

Plaintiff's days off were Saturday (the Friday night-Saturday morning shift) and Sunday (the Saturday night-Sunday morning shift). Thus, the only situation in which plaintiff could have been assigned to work on her Sabbath would have been an overtime assignment.

Plaintiff signed the Overtime Desired list for the fourth quarter of 1985, which ran from October 1, 1985, to December 31, 1985. Since the Postal Service had to use the Overtime Desired list first to cover any anticipated overtime, plaintiff's act greatly increased the likelihood that she would be called to work on her Sabbath.

In November 1985, only six clerks, including plaintiff, were qualified to operate GPO Scheme 8 on the MPLSM machine. Although there were manual clerks who knew the scheme in order to sort mail manually, they did not know the MPLSM machine codes. It is undisputed that the mail cannot be sorted nearly as fast manually as it can on the machine. See Court's Ex. 2, p. 235, 238.

Plaintiff was the only employee on the Overtime Desired list who could operate the MPLSM machine for GPO Scheme 8 and who was not regularly scheduled to work the Friday night-Saturday morning shift. The only other employee who knew

GPO Scheme 8 and was not scheduled to work the Friday night-Saturday morning shift was Maureen Higgins, who had chosen not to sign the Overtime Desired list.

## C. *Plaintiff's Suspension*

During the week of November 11, 1985, Ed Hawley, plaintiff's supervisor, was on detail to a higher level position. Therefore, Robert Zajic, a manual supervisor, was the acting supervisor for plaintiff's pay section. Monday, November 11, 1985, was Veteran's Day, a recognized Postal Service holiday. Plaintiff was on emergency annual leave Tuesday and Wednesday, November 12 and 13, 1985. See P.Ex. 14. Carmalita Haflich, one of the employees who operated the MPLSM machine for GPO Scheme 8, was on sick leave the entire week of November 11, 1985. See P.Ex. 9B.

Early in the week, Gerald Trompeter, the General Supervisor, was approached by Zajic about a potential overtime problem for Tour I Saturday, November 16, 1985 (10:30 p.m., Friday, November 15, 1985, through 7:00 a.m., Saturday, November 16, 1985). Zajic determined that overtime would be required; however, the only two employees whose normal work week did not include Friday night and who were qualified to do the job were plaintiff and Maureen Higgins. Plaintiff had voluntarily placed her name on the Overtime Desired list; Ms. Higgins had not.

The overtime assignment provisions of the collective bargaining agreement between the Postal Service and the American Postal Workers Union, the union representing MPLSM clerks, were contained in Article 8, Section 5, which, in November 1985, read in pertinent part:

D. If the voluntary "Overtime Desired" list does not provide sufficient qualified people, qualified full-time regular employees not on the list may be required to work overtime on a rotating basis with the first opportunity assigned to the junior employee.

G. Effective January 19, 1985, full-time employees not on the "Overtime Desired" list may be required to work overtime only if all available employees on the "Overtime Desired" list have worked up to twelve (12) hours in a day or sixty (60) hours in a service week. See P.Ex. 5.

Because the contract prohibited requiring an employee not on the Overtime Desired list to work overtime in place of an employee who was on the Overtime Desired list, plaintiff was the employee who should have been assigned to work. However, because Zajic was aware that plaintiff's religion prevented her from working on her Sabbath (sundown Friday until sundown Saturday), he approached Maureen Higgins and asked if she would work overtime Friday. Higgins had, in the past, voluntarily worked on Friday nights so that plaintiff could be excused. However, on this occasion, Maureen Higgins stated that she had plans and was not willing to work on Friday night.

During the Thursday night/Friday morning shift, Gerald Trompeter spoke with Labor Relations Assistant Patrick Deming about the situation.[1] Trompeter told Deming that if there was no overtime, the mail would be delayed. Deming suggested that Trompeter again approach Ms. Higgins, explain the situation to her, and again ask her if she would volunteer to work overtime on Friday night. Deming then suggested that if Higgins was not willing to work, Trompeter should ask Chief Union Steward Jessie Hayes what the union's position was on who should work and, if Higgins were forced to work, whether the union would file a grievance.

Trompeter approached Maureen Higgins for a second time, explained the situation, and asked if she would be willing to work. Ms. Higgins said she had plans for Friday

---

1. Trompeter testified that all this occurred on Monday or Tuesday. However, Deming specifically remembered that he was approached on Thursday night since he recalled that the situation had to be resolved that night. In addition, plaintiff was on annual leave Monday and Tuesday day night, so Trompeter could not have approached her at that time. Despite the inconsistencies in the testimony regarding the day of the week on which these events occurred, I find the substance of Trompeter's testimony to be credible.

night, she would not volunteer to work, she should not be required to work until the Overtime Desired list had been utilized, and if she were forced to work, she would file a grievance.

Trompeter then approached Chief Union Steward Jessie Hayes who stated that the union would not take a position on who should work or make any concessions for grievances by either employee. Trompeter asked Hayes if she would waive the grievance should Higgins be forced to work. Hayes laughed and said, no.

Trompeter returned to Deming and informed him of Higgins' and Hayes' responses. Deming told Trompeter that the clear language of the contract prevented Higgins from being required to work.

Trompeter then advised plaintiff and Chief Union Steward Jessie Hayes that plaintiff would be required to work. Hayes spoke with Robert Rowan, the Tour Superintendent and Trompeter's supervisor, who agreed that Higgins could not be forced to work and that plaintiff would have to work the overtime.

Employees were not allowed to selectively sign the Overtime Desired list, choosing which days they did or did not prefer to work overtime. Article 8, Section 5.E of the collective bargaining agreement stated that although employees on the Overtime Desired list are required to work overtime in order of seniority, exceptions may be approved by local management "in exceptional cases based on equity (e.g., anniversaries, birthdays, illness, death)." See P.Ex. 5. On rare occasions, the Postal Service made exceptions pursuant to Article 8, Section 5.E, for those employees on the Overtime Desired list who were called to work overtime. Rarely granted, the exceptions were based on equity, and were only granted for situations of a non-recurring nature. Exceptions were never granted when an employee not on the Overtime Desired list would have to work in place of an employee on the Overtime Desired list.

Plaintiff did not report to work Friday night, November 15, 1985. Instead she called in at 10:30 p.m., her reporting time, and said she was unable to come to work due to car trouble.

Article 8, Section 8.B, of the collective bargaining agreement provided that when a full-time regular employee was called in on the employee's non-scheduled day, the employee would be guaranteed eight hours work or pay in lieu thereof. Had the Postal Service been able to contact Ms. Higgins to work in plaintiff's place, it would have been required to pay Higgins for 8 hours of overtime even though Higgins would not have worked a complete 8–hour shift: it was impossible for Higgins to arrive by 10:30 since plaintiff did not call in until 10:30, and the mail must go to the carriers by 7:00 a.m. (the end of the normal Tour I shift).

The Postal Service scheduled overtime for a large number of mail clerks on November 15, 1985. However, none of those people working overtime were qualified to perform plaintiff's job. For example, Edward Franco, a manual clerk who regularly worked on Friday nights, came in two hours early for overtime. Franco had recently begun training on the MPLSM machine. He had worked on the machine for approximately one hour within that 14–day pay period. See P.Ex. 9C. Clearly, he was not qualified to replace plaintiff on the MPLSM machine.

At the end of Tour I (7:00 a.m. Saturday), Zajic, who had returned to his position as manual supervisor,[2] recalled that there remained unprocessed mail. Since the mail goes to the carriers at 7:00 a.m., any mail unprocessed at that time could not go out until the next mail carry. In this case, all unprocessed mail was delayed until the following Monday.

At the request of the Postal Service, plaintiff presented a receipt on Monday, November 18, 1985, from Western Auto in the amount of $9.48 to substantiate her absence. See D.Ex. 25. The Postal Service did not accept this documentation be-

---

**2.** Zajic testified that he was acting machine supervisor (level 16) on November 15, 1985. However, the clock records indicate that he was functioning as a manual supervisor (level 15) on the night of November 15, 1985. See P.Ex. 10.

cause the receipt was dated November 18, plaintiff had come to work on November 17, and there was no further explanation of why she could not have come to work on November 15. The Postal Service's practice was not to accept substantiating documents dated several days after the absence unless the reason was noted on the documentation. As a result, plaintiff was charged as being absent without leave ("AWOL").

On November 18, 1985, plaintiff wrote to Robert Rowan, Tour Superintendent, requesting that her name be taken off the Overtime Desired list because she was unable to work Friday nights. See D. Ex. 24.

On November 23, 1985, plaintiff was given a disciplinary action proposal recommending that she be suspended without pay for seven days due to failure to maintain her assigned work schedule. The disciplinary proposal stated that plaintiff had been disciplined for previous unscheduled absences, and that these unscheduled absences resulted in possible overtime and delayed mail. See P.Ex. 13.

On December 12, 1985, plaintiff was given a seven day unpaid suspension by Ed Hawley, Machine Supervisor, for cumulative poor attendance. The notice of suspension read as follows:

---

The reasons for this suspension are:

You fail to meet the requirements of your position by your failure to maintain your assigned work schedule.

Specifically: Since April 10, 1985, you have failed to work as scheduled on seven occasions. These unscheduled absences are listed below:

| | |
|---|---|
| June 4, 1985 | 8 Hours Emergency Annual Leave |
| July 14, 1985 | 8 Hours Emergency Annual Leave |
| July 17, 1985 | 15 Minutes Late |
| July 22, 1985 | 9 Minutes Late |
| August 5, 1985 | 2 Hours Sick Leave |
| November 12 & 13, 1985 | 16 Hours Emergency Annual Leave |
| November 16, 1985 | 8 Hours Absent Without Leave |

In addition, the following elements of your past record have been considered in arriving at this decision:

On April 10, 1985, you were issued a Letter of Warning for failure to maintain your assigned work schedule.

---

The eight absences listed on the notice total 42 hours, 24 minutes. See P.Ex. 14.

Attendance is the biggest problem with employees of the Postal Service. The Kansas City Office issues hundreds of disciplinary actions per year based on attendance, and many employees are terminated each year due to poor attendance. Approximately 70% of all disciplinary actions issued are for poor attendance. Poor attendance includes all absences not approved in advance, including excused absences. Even employees with legitimate illnesses may be terminated because the Postal Service must have employees who can be present.

On January 20, 1986, plaintiff filed an EEO complaint requesting that (1) the AWOL charge be removed from her record, (2) all harassment regarding her religious beliefs be ceased, (3) she be able to place her name on the Overtime Desired list but be excused from 6th day on Friday night, and (4) she be paid for all overtime that was missed since she was "forced to remove" her name from the Overtime Desired List. See P.Ex. 15. In describing the

specific situation in her complaint, plaintiff wrote:

> I had to voluntarily request that my name be remove[d] from the overtime desired list since I am not able to work a 6th day (Friday night) and that request was granted.

See P.Ex. 15.

In February 1986, a settlement was reached wherein the charge of Absent Without Leave was removed from plaintiff's record. The settlement agreement provided as follows:

---

As a final and complete settlement of the subject grievance and without prejudice to the position of the United States Postal Service in this or any other case, and with the understanding that the Union shall not cite this settlement in any other grievance proceeding, or any other forum, the following resolution has been entered into by the parties:

This is to confirm that the parties agree that the charge of Absent Without Leave on November 15, 1985, shall be withdrawn.

The grievant is fully aware of her responsibility to report for duty as scheduled and that any future incidents of failure to report for duty as scheduled may result in disciplinary action being taken.

---

See P.Ex. 16. A similar settlement was reached wherein the Notice of Seven Day Suspension was expunged from plaintiff's record and she was reimbursed for monies lost while on suspension. See P.Ex. 17.

Plaintiff's EEO complaint seeking permanent excuses from working Friday overtime while being allowed to remain on the Overtime Desired list was heard by an Administrative Law Judge of the EEOC. During that hearing, the following questioning by Judge Schwendinger occurred:

Q. In those kind of situations, how do you propose that the agency, assuming that for a moment you want them to let you not work, correct, on your sabbath?

A. Yes.

Q. Other than letting you not work, how do they deal with the fact that you are not working? Don't they still have to work?

A. Yes.

Q. Who does that work then?

A. The other employees or either they have had to schedule someone else in for a sixth day.

Q. Would you contend that they can be required to take somebody that is not on the Overtime Desired List and make them work for you?

A. No.

Q. What if they don't have somebody that is not on the Overtime Desired List, what do they do then?

A. I don't know what they have done but like I said, when I am not here for a sixth day, but they have apparently gotten the mail out.

Q. In other words, you are contending they can do without?

A. Yes, they have done without me.

Q. And they should be required to do without you?

A. That they should be required? Yes, they would.

Q. So they can make someone work for you that is not on the list, is that correct?

A. Yes. If they cannot—

Q. So the real accommodation that you are requesting is that in the absence of somebody else on the Overtime Desired List being available, that they do without?

A. Yes.

Q. Isn't that what it boils down to?

A. Yes, it is.

See Court's Ex. 2, p. 224–225.

Plaintiff has never been asked to work on her Sabbath since she took her name off the Overtime Desired list. Trompeter, Zajic, Hawley and Deming each testified that he never told plaintiff to take her name off the Overtime Desired list or that she could not put her name back on the Overtime Desired list. In addition, each testified that he never removed plaintiff's name from Overtime Desired list.

### D. *Plaintiff's Version*

Plaintiff testified that during the week of November 11, 1985, Ed Hawley informed her that she was scheduled to work overtime on Friday, November 15, 1985, and that if she did not work she would be listed as AWOL. Plaintiff contacted Jessie Hayes who allegedly told her that management said plaintiff was to be excused. Plaintiff spoke with Trompeter who reportedly said she was excused this time, and that Maureen Higgins would be required to work first because she had less seniority. According to plaintiff, Trompeter said that she would have to work next time because the overtime had to be worked on a rotating basis.

In addition, plaintiff testified that after her absence on November 15, 1985, Robert Rowan and Gerald Trompeter told her that if she did not remove her name from the Overtime Desired list, she would continue to be charged as AWOL which could result in her termination. Plaintiff later testified that she continued to sign the Overtime Desired list, but that someone refused to put her name on the official typed list.

I do not find this testimony credible for the following reasons:

1. Plaintiff's testimony is in accordance with the notes on an undated page ("the page") taken from a notebook she created. See D.Ex. 20, p. 3. The first page of the notebook is dated December 6. The undated page states "will report Friday night 13 for a 6th day". The page goes on to say that Trompeter told plaintiff she would be excused and that Higgins would work since Higgins had less seniority, but that plaintiff would more than likely be drafted for the following Friday. November 13, 1985, was on a Wednesday, not a Friday. December 13, 1985, was indeed on a Friday. This leads to the conclusion that the page was reporting an event that occurred in December 1985, not in November 1985 as plaintiff testified.

2. In December 1985, plaintiff's name was not on the Overtime Desired list. In that situation, when overtime was required, Maureen Higgins was required to work first since she had less seniority than plaintiff. In addition, when there was no one available on the Overtime Desired list, the employees were called in on a rotating basis beginning with the least senior employee. Plaintiff's testimony is in accordance with her name not being on the Overtime Desired list as was the case in December 1985, not November 1985.

3. Plaintiff first testified that the page was written in December, then later said that the entry was made on November 13. However, plaintiff was on emergency annual leave on November 13 and could not have spoken with Trompeter that day. See P.Ex. 14.

4. Four different witnesses, including Gerald Trompeter, testified that no one ever told plaintiff to remove her name from the Overtime Desired list. In addition, plaintiff testified that she had never before said that Rowan and Trompeter told her to remove her name (not even during the administrative hearings on this issue) because she had never been asked that question. Furthermore, during the administrative hearings on plaintiff's EEO complaint, plaintiff testified that it was her

decision to remove her name from the Overtime Desired list. See Court's Ex. 2, p. 191.

5. Plaintiff later testified that she continued to sign the Overtime Desired list, but that someone refused to put her name on the official typed list. However, plaintiff never complained about this or mentioned it during the EEO hearings. Furthermore, plaintiff testified that during her entire Postal Service career, her name had been on the Overtime Desired list. However, plaintiff's name did not appear on the Overtime Desired list for the third quarter of 1985.

During the trial, plaintiff offered the testimony of Daryl Morley, a postal employee, in support of her disparate treatment argument. Morley became a member of the World Wide Church of God in 1977. The tenets of his church require that he refrain from secular labor on his Sabbath, which runs from sundown Friday until sundown Saturday. Until 1985, when Morley (a manual clerk who never worked in plaintiff's section) was called to work on Friday night, he would come in on Saturday night instead. At some point, Morley changed floors and was assigned to a new supervisor who would not permit him to work overtime on Saturdays instead of Fridays. Morley then removed his name from the Overtime Desired list.

In 1987, Morley put his name back on the Overtime Desired list. When he was scheduled to work overtime on a Friday night, he did not show up and was charged with being absent without leave. Morley filed a grievance which was settled on November 16, 1987. The settlement stated that:

[Morley] shall be allowed to place his name on the overtime desired list and that [management] will make every ef-fort to provide reasonable accommodation for [Morley's] religious beliefs to the extent that to do so would not create an undue hardship or would impose on the contractual rights of other employees. See P.Ex. 18.

Morley has never been in a situation where there was only one person besides himself who was qualified and available to work.

## II. RELIGIOUS DISCRIMINATION

Plaintiff's claim of religious discrimination is based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16. Specifically, plaintiff claims that the Postal Service discriminated against her when it "conditioned her status on the Overtime Desired List ... upon her agreement to work on her sabbath" and this alleged condition resulted in the removal of her name from the Overtime Desired list on or about November 18, 1985.

Section 703(a), 42 U.S.C. § 2000e–2(a), of the Civil Rights Act makes it an unlawful employment practice for an employer to discriminate against an employee or a prospective employee on the basis of his or her religion.[3] The emphasis of both the language and the legislative history of the statute is on eliminating discrimination in employment: similarly situated employees are not to be treated differently solely because they differ with respect to religion. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71, 97 S.Ct. 2264, 2270, 53 L.Ed.2d 113 (1977).

The term "religion" in § 701(j), 42 U.S.C. § 2000e(j), of the Civil Rights Act includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's re-

---

**3.** Specifically, Section 2000e–2(a) provides:
 (a) It shall be an unlawful employment practice for an employer
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion ...; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... religion....

ligious observance or practice without undue hardship. The intent and effect of this definition was to make it an unlawful employment practice under § 703(a)(1), 42 U.S.C. § 2000e–2, for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of its employees. *Trans World Airlines, Inc. v. Hardison,* 432 U.S. at 73–74, 97 S.Ct. at 2271–72.

### A. *Prima Facie Case*

 To establish a prima facie case of religious discrimination, plaintiff must plead and prove by a preponderance of the evidence that (1) she has a bona fide belief that compliance with an employment requirement is contrary to her religious faith, (2) she informed her employer about the conflict, and (3) she was disciplined because of her refusal to comply with the employment requirement. *Johnson v. Angelica Uniform Group, Inc.,* 762 F.2d 671, 673 (8th Cir.1985); *Brown v. General Motors Corp.,* 601 F.2d 956, 959 (8th Cir.1979).

There is no question that plaintiff notified the Postal Service about her religious tenets which required that she refrain from secular work on her Sabbath. However, there is some doubt as to whether working overtime on Friday nights was an "employment requirement." Had plaintiff not placed her name on the Overtime Desired list, she would not have been called to work overtime on her Sabbath before other qualified employees were called. Therefore, since signing the Overtime Desired list was an option and not an employment requirement, doubt arises as to whether plaintiff has even established a prima facie case.

 However, since this action was not dismissed for want of a prima facie case, it was fully tried on the merits, and the defendant did everything that would be required of it if the plaintiff had properly made out a prima facie case, whether the plaintiff really did make out a prima facie case is no longer relevant. *Ansonia Board of Education v. Philbrook,* 479 U.S. 60, 67–68, 107 S.Ct. 367, 371–72, 93 L.Ed.2d 305 (1986); *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983).

### B. *Reasonable Accommodation*

 After a prima facie case of religious discrimination is established, the burden shifts to the defendant to prove by a preponderance of the evidence that it met its obligation under Title VII to accommodate the religious beliefs of the plaintiff. *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977); *American Postal Workers Union, etc. v. Postmaster General,* 781 F.2d 772, 775 (9th Cir.1986). Title VII requires an employer to reasonably accommodate the religious beliefs and practices of its employees, short of incurring an "undue hardship." *Trans World Airlines, Inc. v. Hardison,* 432 U.S. at 75, 97 S.Ct. at 2272. The determination of when the reasonable accommodation requirement has been met, and the circumstances under which a particular accommodation may cause undue hardship, must be made in the particular factual context of each case. *Anderson v. General Dynamics Convair Aerospace Div.,* 589 F.2d 397, 400 (9th Cir.), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979).

In *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), the plaintiff, a Saturday Sabbatarian, was assigned to Building 1 where he had enough seniority to choose a work schedule that excluded Saturdays. Later, he transferred into Building 2 where he had low seniority and, as a result, was scheduled to work Saturdays. The plaintiff was terminated when he refused to work on his Saturday Sabbath. The plaintiff sued his employer claiming that he had been discriminated against based on his religion. The Supreme Court, in affirming the verdict for the defendant, found that the seniority system represented a "significant accommodation to the needs, both religious and secular, of all of [the defendant's] employees.... [T]he seniority system represents a neutral way of minimizing the number of occasions when an employee must work on a day that he would

prefer to have off." *Id.* at 78, 97 S.Ct. at 2274. The Court went on to say that "absent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences." *Id.* at 82, 97 S.Ct. at 2276.

▋ In this case, I find that not only the seniority system, but the Overtime Desired list provision in the collective bargaining agreement, represent significant accommodations by the Postal Service to plaintiff's religious needs. First, the option of signing the Overtime Desired list accommodates those employees who, for religious or secular reasons, do not wish to work overtime. See Article 8 Memorandum, page 181 of P.Ex. 5. Second, those employees who have chosen not to sign the Overtime Desired list are called to work overtime on the basis of seniority with the junior employee being called first.

▋ Where the employer proposes an accommodation which effectively eliminates the religious conflict faced by a particular employee, the inquiry under Title VII reduces to whether the accommodation reasonably preserves the affected employee's employment status. *American Postal Workers Union v. Postmaster General,* 781 F.2d at 776–777. Although the statutory burden to accommodate rests with the employer, the employee has a correlative duty to make a good faith attempt to satisfy her needs through means offered by the employer. *Id.* at 777; *Brener v. Diagnostic Center Hospital,* 671 F.2d 141 (5th Cir. 1982); *Wren v. T.I.M.E.–D.C., Inc.,* 453 F.Supp. 582, 584 (E.D.Mo.1978), *aff'd,* 595 F.2d 441 (8th Cir.1979). "In other words, a reasonable accommodation need not be on the employee's terms only." *Brener v. Diagnostic Center Hospital,* 671 F.2d at 146.

I find that plaintiff did not make a good faith attempt to satisfy her religious needs through means offered by the Postal Service. Had plaintiff not signed the Overtime Desired list, she would not have been in the position of being the first person in her pay section to be called when overtime was required on Friday nights. Furthermore, plaintiff put herself in the position of having very few co-workers who were qualified to do her job when she transferred into pay section 218, which was not a promotion. While in pay section 215, there were many employees who could cover for plaintiff when she was called to work overtime on Friday nights, and in fact, that is how plaintiff was able to remain on the Overtime Desired list yet avoid working Friday nights.

Plaintiff voluntarily left a situation where she was able to work overtime throughout the week and still avoid working on Friday nights. After transferring to a smaller, more specialized pay section, plaintiff voluntarily placed her name on the Overtime Desired list, knowing that she was one of only two employees who were not regularly scheduled to work Friday nights. Furthermore, plaintiff was aware that the other employee who was not regularly scheduled to work Friday nights had chosen not to sign the Overtime Desired list. This meant that whenever overtime was required in pay section 218 on Friday nights, plaintiff would be the first employee called. This is a situation that plaintiff voluntarily placed herself in, contrary to her duty to make a good faith attempt to satisfy her religious needs through means offered by the Postal Service.

The evidence presented at trial clearly shows that the Postal Service provided accommodations for its employees' religious needs in every situation short of imposing on other employees. When plaintiff first became employed with the Postal Service, she was scheduled to work Friday through Tuesday. However the Postal Service granted plaintiff's request to have Fridays and Saturdays off. After plaintiff transferred to pay section 215 in 1981, her scheduled work days were Wednesday through Sunday. The Postal Service permitted plaintiff to use annual leave or change of scheduling requests to avoid working on her Sabbath. In addition, plaintiff voluntarily placed her name on the Overtime Desired list. On each occasion when plaintiff was called to work on Friday night, the Postal Service arranged for another qualified employee on the Overtime

Desired list to work instead. Finally, plaintiff voluntarily transferred to pay section 218 and again placed her name on the Overtime Desired list. When plaintiff was scheduled to work on Friday night, November 15, 1985, the Postal Service approached Maureen Higgins twice and asked if she would work in plaintiff's place. The Postal Service asked the Chief Union Steward if the union would waive filing a grievance on Ms. Higgins' behalf if she were forced to work. Finally, after unsuccessfully making attempts to accommodate plaintiff on November 15, 1985, the Postal Service had no choice but to require plaintiff to work overtime on Friday night.

In addition, the Postal Service accommodated Daryl Morley the same way. The Postal Service agreed to "provide reasonable accommodation for [Morley's] religious beliefs to the extent that to do so would not create an undue hardship or would impose on the contractual rights of other employees." See P.Ex. 18. There has been no evidence that the Postal Service did not accommodate its employees' religious needs short of creating an undue hardship or imposing on the contractual rights of other employees.

Because the Postal Service has established that it provided a reasonable accommodation to plaintiff's religious needs, it has satisfied its obligation under Title VII.

### C. *Undue Hardship*

■ An employer has met its obligation under § 701(j), 42 U.S.C. § 2000e(j), when it demonstrates that it has offered a reasonable accommodation to the employee. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship. The extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship. *Ansonia Board of Education v. Philbrook*, 479 U.S. 60, 68–69, 107 S.Ct. 367, 371–72, 93 L.Ed.2d 305 (1986).

Because the Postal Service proved that it reasonably accommodated plaintiff's religious needs, the statutory inquiry is at an end. However, even if undue hardship

were an issue, I find that each of plaintiff's suggested accommodations would result in undue hardship to the Postal Service.

Plaintiff suggested three accommodations that the Postal Service could have provided: have "someone else" do her job; force the remaining MPLSM machine clerks to key the machine for 45 minutes before the 15 minute collecting/loading break rather than the normal 30 minutes; or "do without."

### 1. *Have someone else do the job.*

■ Plaintiff's first suggested accommodation was to have "someone else" do the job in her absence. Plaintiff has been unable to suggest who that someone else might be. It is clear that the only other person who was qualified to do plaintiff's job and who was not already scheduled to work on Friday night was Maureen Higgins. Ms. Higgins was not on the Overtime Desired list.

As discussed above, the collective bargaining agreement prohibited forcing an employee not on the Overtime Desired list to work overtime before the Overtime Desired list had been utilized. Ms. Higgins told the Postal Service several times that she would not voluntarily work overtime and that if she were forced to work, she would file a grievance. In addition, the Chief Union Steward told the Postal Service that the union would not waive filing a grievance on behalf of Ms. Higgins if she were forced to work.

■ Title VII does not require an employer to deprive some employees of their contractual rights in order to accommodate or prefer the religious needs of others. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. at 81, 97 S.Ct. at 2275; *Huston v. International Union, United Auto, etc.*, 559 F.2d 477, 480 (8th Cir.1977). Requiring an employer to discriminate against some employees in order to enable others to observe their Sabbath is an undue hardship. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. at 85, 97 S.Ct. at 2277. Therefore, the Postal Service was not required to force Maureen Higgins to work in

place of plaintiff so that plaintiff could observe her Sabbath.

This same issue was the subject of a grievance decided by an arbitrator on April 13, 1990. In that case, the grievant was required to work a scheduled holiday while a junior employee was excused from working because the holiday fell on his Sabbath. In granting the grievance, the arbitrator stated:

Title VII of the Civil Rights Act of 1964, the Equal Employment Commission guidelines stated that the duty imposed by Title VII "includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees ... where such accommodations can be made without hardship on the conduct of the employer's business." The action of the supervisor was in accordance with the spirit of the above statement. However by following this path he was taking steps inconsistent with the Local Memorandum of Understanding.

It is indeed unfortunate that in accommodating the religious preference of an employee, and the spirit in which it was done, now becomes the subject of a grievance. This case might have been distinguished from [*Trans World Airlines, Inc., v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977)], if management had made more overt efforts to find a possible alternate or substitute for the junior employee. There is not even any evidence that the grievant was asked if he wold [sic] volunteer. As such the reliance on the religious accommodation instead of the seniority provisions is a breach of the agreement.

See *American Postal Workers Union v. United States Postal Service*, E7C–2N–C 966 (Powell, Arbitrator).

Had the Postal Service accommodated plaintiff by forcing Maureen Higgins to work, the result would have been the same as that described above.

Aside from Maureen Higgins, the only other employees who could have sorted the mail were the manual clerks. However, it is undisputed that the manual clerks could not sort the same amount of mail as the machine clerks. Therefore, the Postal Service would have been required to pay several manual clerks overtime in order to cover for plaintiff. Clearly this is more than a de minimis cost and would therefore constitute an undue hardship.

2. *Force the remaining MPLSM machine clerks to key the machine for 45 minutes before the 15 minute collecting/loading break rather than the normal 30 minutes.*

■ Plaintiff's second suggested accommodation was to force the remaining MPLSM machine clerks to key the machine for 45 minutes before the 15 minute collecting/loading break rather than the normal 30 minutes. However, it is undisputed that this practice, utilized during emergencies only, was not authorized by the collective bargaining agreement and resulted in grievances against the Postal Service. Therefore, the Postal Service was not required to force the remaining machine clerks to key for 45 minutes instead of 30 in order to make up for plaintiff's absence on the Friday night shift.

3. *Do without.*

■ Plaintiff's third suggested accommodation was for the Postal Service to just "do without." This alternative would involve costs to the Postal Service in the form of lost efficiency. To require the Postal Service to bear more than a de minimis cost in order to give plaintiff Fridays off is an undue hardship. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. at 84, 97 S.Ct. at 2276. This is especially true since an employer as large as the Postal Service undoubtedly has many employees whose religious observances prohibit them from working on certain days. Therefore, this proposed accommodation, if employed throughout the entire Postal Service, would result in a substantial burden. *Id.* at 85 n. 15, 97 S.Ct. at 2277 n. 15.

In a case decided November 15, 1990, Arbitrator Robert Williams stated, "[s]ince the reason for requiring regular attendance is the hardship absenteeism causes on oth-

er employees and the Employer, one has difficulty imagining any case in which an absence on a scheduled workday would not cause hardship." See *United States Postal Service v. National Association of Letter Carriers, AFL–CIO*, S7N–3C–D 26272 (Williams, Arbitrator).

Because the Postal Service has established that it provided a reasonable accommodation to plaintiff's religious needs, it has satisfied its obligation under Title VII. Furthermore, although the Postal Service is not required to further show that each of the employee's alternative accommodations would result in undue hardship, I find that each of the suggested accommodations would indeed result in undue hardship to the Postal Service.

### III. DISPARATE TREATMENT

As an alternative theory of recovery, plaintiff argued that she was the victim of disparate treatment by the Postal Service based on her religious beliefs. During the trial, defendant argued that disparate treatment applies because plaintiff was, in the past, excused from overtime on her Sabbath based on Article 8, Section 5.E of the collective bargaining agreement, and on November 15, 1985, the Postal Service refused to excuse her based on that same clause. Later in the trial, plaintiff argued that disparate treatment applies because the Postal Service excused Daryl Morley (also a Saturday Sabbatarian) from working overtime on his Sabbath, but the Postal Service refused to excuse her from working overtime on her Sabbath. Finally, plaintiff argued that disparate treatment applies because the Postal Service excused employees from working overtime for secular reasons, but refused to excuse her for religious reasons.

Disparate treatment means that an employer treats some people less favorably than others because of race, color, religion, sex, or national origin. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Underwood v. Jefferson Memorial Hosp.*, 639 F.2d 455, 457 (8th Cir.1981).

A disparate treatment case alleging a violation of the Civil Rights Act of 1964 §§ 701 et seq., 703, as amended, 42 U.S.C. §§ 2000e et seq., 2000e–2, proceeds in three stages. First, the plaintiff must establish a prima facie case showing that the employer's actions (if not otherwise explained) were based on illegal discrimination. *Heymann v. Tetra Plastics Corp.*, 640 F.2d 115, 119–120 (8th Cir.1981). The burden of establishing a prima facie case is not onerous. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). In addition, the plaintiff must prove that the defendant's intent or motive was to discriminate. *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988); *Kirby v. Colony Furniture Co.*, 613 F.2d 696, 702 (8th Cir.1980).

Second, if a prima facie case is established, the employer must produce some evidence that it had a legitimate non-discriminatory reason for its actions. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094–95. The employer need not prove the absence of discriminatory motive, but only produce evidence that would reasonably infer a legitimate reason for its actions. *Heymann v. Tetra Plastics Corp.*, 640 F.2d at 120.

Finally, if a legitimate consideration or reason is presented, the plaintiff must prove that this consideration or reason is a mere pretext for discrimination. *Id.* The plaintiff has the burden of persuasion in establishing a pretext. *Kirby v. Colony Furniture Co.*, 613 F.2d at 702.

Although this shifting burden of going forward with the evidence is designed to aid the court and the litigants in the presentation of evidence, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff at all times." *Watson v. Ft. Worth Bank & Trust*, 487 U.S. at 986, 108 S.Ct. at 2784 (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101

S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1983)); *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983).

■ Different treatment does not necessarily establish disparate treatment. The evidence must show either disparate treatment of the plaintiff compared to a similarly situated co-worker or an illegal discriminatory reason for the employer's action. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 69 (6th Cir.1985).

Although the burden is not "onerous," I find that the plaintiff did not make a prima facie case of disparate treatment by the Postal Service. The plaintiff argued three alternative theories for recovery under disparate treatment: (1) the Postal Service treated plaintiff differently as to the Overtime Desired list when she transferred from pay section 215 to pay section 218; (2) the Postal Service treated Daryl Morley, another postal employee and Saturday Sabbatarian, better than her by allowing him to put his name on the Overtime Desired list; (3) the Postal Service excused other employees from working overtime for nonreligious reasons. All three theories are flawed in fact, law, logic or all three. Moreover, plaintiff provided no evidence that the Postal Service's intent or motive was to discriminate, which is essential for the plaintiff to prevail.

During the trial, plaintiff alleged that she was treated differently at pay section 218 after she transferred from pay section 215. A novel theory, plaintiff seeks to compare herself with herself to establish disparate treatment. Her argument, as far as I can tell, is that the Postal Service accommodated her Saturday Sabbath while she was on the Overtime Desired list at pay section 215, but refused to continue that accommodation when she moved to pay section 218.

This argument ignores several important facts. First, historically the Postal Service indeed accommodated plaintiff's religious beliefs when it was in a position to do so (hardly a compelling starting point for

plaintiff in her journey to establish disparate treatment based on religion). Second, the evidence showed that the Postal Service attempted to accommodate plaintiff's Sabbath on November 15, 1985, but was unable to do so without infringing on the contractual rights of another employee. Third, the Postal Service instructed plaintiff to work on November 15, 1985, because she had voluntarily placed her name on the Overtime Desired list, not because of a discriminatory intent or motive. Fourth, the Postal Service treated all Saturday Sabbatarians the same including the plaintiff's witness, Daryl Morley.

The plaintiff presented an alternative theory of recovery at trial; that is, she was treated different than Daryl Morley, another Saturday Sabbatarian, who worked as a manual sorter at the Post Office. The trial evidence showed that the Postal Service accommodated Morley, who was on the Overtime Desired list, when the accommodation did not create an undue hardship for the Postal Service or any other employee. Evidently, plaintiff's argument is that the Postal Service accommodated Morley; therefore, it should accommodate her.

In a disparate treatment analysis, the court is usually called upon to compare the treatment of a member of a protected class to that of a co-worker similarly situated. The conclusion to be drawn is that, but for the class, the treatment would be the same.

Here, plaintiff asks the court to compare the treatment of members of the same class: plaintiff and Daryl Morley. Frankly, such a comparison lends no weight to any of plaintiff's theories of recovery since the trial evidence clearly established that the Postal Service treated both employees the same. When the Postal Service was in a position to accommodate the religious tenets of plaintiff and Daryl Morley, it did so. Moreover, Morley was never in a situation, as here with plaintiff, where only one other person was qualified and available to work but was not on the Overtime Desired list. In addition, Morley was never excused from working overtime when an employee not on the Overtime Desired list would be required to work in his place.

Finally, plaintiff raised a third theory of disparate treatment during closing argument. Plaintiff invited the court to draw a comparison between plaintiff and other employees on the Overtime Desired list who had been excused from overtime for non-religious reasons. Although there was some discussion of this practice, plaintiff presented no evidence in support of this theory. Indeed, the collective bargaining agreement allows for such excuses in exceptional cases. However, the provision was never intended to provide a basis for recurring absences. As the evidence presented by the Postal Service established, that exception was never used for absences of a recurring nature or when an employee not on the Overtime Desired list would be required to work in place of an employee on the Overtime Desired list.

In the final analysis, plaintiff has failed to show that the Postal Service treated her any differently than anyone else on the Overtime Desired list. But even if she had made a prima facie case of disparate treatment, there is not one iota of evidence that such treatment was based upon religious discrimination. Instead, the Postal Service produced substantial, credible evidence that its decisions as to who would be called to work from the Overtime Desired list were based upon legitimate, reasonable considerations—the collective bargaining agreement. Lastly, plaintiff presented no evidence that the Postal Service's reason for requiring her to work was a pretext for discrimination.

## IV. CONCLUSION

I find by a preponderance of the evidence that the Postal Service provided a reasonable accommodation to plaintiff's religious needs, and therefore has satisfied its obligation under Title VII. Furthermore, although the Postal Service is not required to further show that each of the employee's alternative accommodations would result in undue hardship, I find that each of the suggested accommodations would indeed result in undue hardship to the Postal Service.

In addition, I find that plaintiff has failed to establish a prima facie case of disparate treatment and presented no evidence to support this theory. Therefore, it is

ORDERED that judgment be entered in favor of the defendant.

Title VII authorizes the award of attorney's fees to a prevailing defendant only if the action brought is found to be "unreasonable, frivolous, meritless or vexatious." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). I do not find that plaintiff's case was unreasonable, frivolous, meritless or vexatious. Therefore, it is further

ORDERED that each party bear its own costs.

## APPENDIX A

### CONTRACT

The overtime assignment provisions of the collective bargaining agreement between the Postal Service and the American Postal Workers Union, the union representing MPLSM clerks, are contained in Article 8, Section 5, which, in November 1985, read in pertinent part:

Section 5. Overtime Assignments

When needed, overtime work for regular full-time employees shall be scheduled among qualified employees doing similar work in the work location where the employees regularly work in accordance with the following:

A. Two weeks prior to the start of each calendar quarter, full-time regular employees desiring to work overtime during that quarter shall place their names on an "Overtime Desired" list.

B. Lists will be established by craft, section, or tour in accordance with Article 30, Local Implementation [which states that "Overtime Desired" lists shall be by craft and section, and that "Stations, Branches, Airport Mail Facility, Transfer Office, MPLSM/ZMT, MPFSM, OCR, Tour Superintendent's Office will be considered separate and individual Units individually identified in each posting"].

C.1.a. Except in the letter carrier craft, when during the quarter the need for overtime arises, employees with the necessary skills having listed their names will be selected in order of their seniority on a rotating basis.

\* \* \* \* \* \*

D. If the voluntary "Overtime Desired" list does not provide sufficient qualified people, qualified full-time regular employees not on the list may be required to work overtime on a rotating basis with the first opportunity assigned to the junior employee.

E. Exceptions to C and D above if requested by the employee may be approved by local management in exceptional cases based on equity (e.g., anniversaries, birthdays, illness, death).

F. Effective January 19, 1985, excluding December, no full-time regular employee will be required to work overtime on more than four (4) of the employee's five (5) scheduled days in a service week or work over ten (10) hours on a regularly scheduled day, over eight (8) hours on a non-schedule day, or over six (6) days in a service week.

G. Effective January 19, 1985, full-time employees not on the "Overtime Desired" list may be required to work overtime only if all available employees on the "Overtime Desired" list have worked up to twelve (12) hours in a day or sixty (60) hours in a service week. Employees on the "Overtime Desired" list:

1. may be required to work up to twelve (12) hours in a day and sixty (60) hours in a service week (subject to payment of penalty overtime pay set forth in Section 4.D for contravention of Section 5.F); and

2. excluding December, shall be limited to no more than twelve (12) hours of work in a day and no more than sixty (60) hours of work in a service week.

However, the Employer is not required to utilize employees on the "Overtime Desired" list at the penalty overtime rate [double time] if qualified employees on the "Overtime Desired" list who are not yet entitled to penalty overtime are available for the overtime assignment.

The Article 8 Memorandum stated, in pertinent part, as follows:

... [I]t is the intent of the parties in adopting changes to Article 8 to limit overtime, to avoid excessive mandatory overtime, and to protect the interests of employees who do not wish to work overtime, while recognizing that bona fide operational requirements do exist that necessitate the use of overtime from time to time. The parties have agreed to certain additional restrictions on overtime work, while agreeing to continue the use of overtime desired lists to protect the interests of those employees who do not want to work overtime....

Article 8, Section 8.B, stated as follows:

When a full-time regular employee is called in on the employee's non-scheduled day, the employee will be guaranteed eight hours work or pay in lieu thereof.

Section 313.6 of the Personnel Operations Handbook, which was incorporated into the collective bargaining agreement pursuant to Article 19 of the agreement, stated as follows:

313.6 Religion

.61 Eligibles whose religion prohibits working on a specific day of the week on which they may be scheduled may not be omitted from consideration for such reason. The eligible should be advised that:

a. Reasonable efforts will be made to accommodate the religious beliefs,

b. If hired as a part-time flexible, reasonable efforts will be made not to schedule duty on the eligible's Sabbath, and

c. Once converted to full-time status, reasonable efforts to accommodate this religious conviction will be undertaken, although such efforts may require a transfer or result in some inconvenience.

.62 Although the Postal Service will attempt to avoid or minimize such inconvenience, eligibles cannot be assured that accommodations to their religious beliefs:

a. Will not result in substantial inconvenience to them because of the business requirements of the Postal Service, or

b. In some instances, result in their termination if a reasonable accommodation cannot be made.