# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 99-1914

_____

|  |  |  |
|---|---|---|
| Jodie Henderson, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Western District of Arkansas. |
| | * | |
| Simmons Foods, Inc., | * | |
| | * | |
| Appellant. | * | |
| | * | |

_____

Submitted: December 14, 1999
Filed: June 16, 2000

_____

Before RICHARD S. ARNOLD and HANSEN, Circuit Judges, and MELLOY,[1] District Judge.

_____

HANSEN, Circuit Judge.

After a trial in district court,[2] a jury found that Simmons Foods, Inc. (Simmons) violated Title VII of the Civil Rights Act of 1964 and the Arkansas Civil Rights Act of

_____

[1]The Honorable Michael J. Melloy, United States District Judge for the Northern District of Iowa, sitting by designation.

[2]The Honorable Jimm Larry Hendren, Chief Judge, United States District Court for the Western District of Arkansas, presiding.

1993 by failing to remedy a hostile work environment and constructively discharging its employee, Jodie Henderson. The jury awarded Henderson $60,000 in compensatory damages, $15,000 in lost wages, and $100,000 in punitive damages. In addition, the district court awarded Henderson $28,845 in attorneys' fees. Simmons appeals. We affirm.

## I.
## Facts and Background

We recite the evidence in the light most favorable to the jury's verdict. <u>See</u> <u>Blackmon v. Pinkerton Sec. & Investigative Serv.</u>, 182 F.3d 629, 630 (8th Cir.1999). Henderson began working at Simmons's chicken processing plant in 1981. Her employment at Simmons proceeded without incident until 1994 when she met a male coworker named Sergio Sanchez. Sanchez persistently and continuously sexually harassed Henderson. Sanchez verbally accosted Henderson with a barrage of crude sexual vulgarities, and he often physically touched her in a sexually offensive manner. Henderson reported Sanchez's conduct to her supervisors, but the sexual harassment continued until 1995 when Simmons transferred Sanchez to a different shift.

About a year and a half later, Sanchez returned to Henderson's shift. In fact, Simmons placed Sanchez on a production line located just four feet away from Henderson. Henderson voiced a complaint to her supervisor. She questioned why Simmons would place Sanchez in such close proximity to her given Sanchez's history of sexual harassment toward her. The supervisor told Henderson that Simmons had no other work area in which it could place Sanchez. Henderson's division, however, consisted of eight food craft lines. (<u>See</u> Appellant's App. at 13-14.) Each line contained more than 20 workers. (<u>See</u> <u>id.</u> at 14.)

A few months after Sanchez returned to Henderson's shift, Sanchez began verbally harassing Henderson, using what can only be described as the crudest of

sexual vulgarities. Henderson once again reported the remarks to her supervisor and to Simmons's manager of human resources, Will Higginbotham. Higginbotham informed Henderson that she was making very serious allegations. Higginbotham warned Henderson that if the company determined that her allegations were unfounded, she might be terminated. (See Appellant's App. at 19) ("[I]f you make these allegations and they're not true, you could be subject to losing your job.") In its posttrial order, the district court found these statements to be veiled threats. (Appellant's Add. at 10.)

On April 9, 1997, Henderson visited the company nurse concerning pain in her wrist. One of Henderson's supervisors, Rick Speaks, accompanied Henderson. Henderson told the nurse about Sanchez's harassment and how Simmons had not taken any action. She also indicated that another coworker, Manuel Garcia, had joined Sanchez in sexually harassing her. Following her visit with the nurse, Henderson met with Speaks and two other supervisors. Henderson informed the supervisors that two coworkers, Nina Hatman and Somlith Dittavong, might have overheard the harassment. The supervisors questioned Hatman and Dittavong, but they denied witnessing sexual harassment. Hatman indicated, however, that the noise level at the plant prevented her from overhearing conversations even at nearby work stations.

Higginbotham interviewed Sanchez and Garcia regarding Henderson's sexual harassment complaint. He also interviewed Dittavong. Sanchez and Garcia denied sexually harassing Henderson. Dittavong once more indicated that he did not overhear anything. Neither Sanchez, Garcia, nor Dittavong speak English as their primary language. Sanchez and Garcia are fluent in Spanish but have difficulty speaking English. Dittavong speaks Laotian and is barely able to communicate in English. Simmons's supervisors did not utilize interpreters when they interviewed Sanchez, Garcia, and Dittavong. Higginbotham did warn Sanchez and Garcia that sexual harassment constituted grounds for termination.

Following the meeting with Higginbotham, Sanchez and Garcia ceased their verbal sexual harassment of Henderson. Sanchez, however, targeted obscene hand gestures at Henderson. Henderson reported Sanchez's actions to Speaks. Simmons, however, took no further action. The company also did not transfer Henderson or Sanchez to a different location.

On July 28, 1997, Henderson contacted Higginbotham and informed him that she could no longer continue her employment at Simmons "[given] the conditions." (Appellant's App. at 24, 125.) Higginbotham asked Henderson what, if anything, he could have done to prevent Henderson from leaving her position at Simmons. Henderson replied that Higginbotham should have "separated me and [Sanchez] - what I've asked millions of times, to separate us. How hard would that have been to do?" (Id. at 25.)

After Henderson left Simmons, she applied for positions with over 30 different employers. Henderson did not have a high school diploma, and she lacked any sort of formal training outside the poultry industry. Nonetheless, she sought employment at nonpoultry-related businesses such as nursing homes, retail establishments, and restaurants, but found none.

Henderson filed a civil rights action against Simmons in which she alleged violations of both Title VII of the Civil Rights Act of 1964, see 42 U.S.C. § 2000e-2(a)(1), and the Arkansas Civil Rights Act of 1993.[3] See Ark. Code Ann. §§ 16-123-101 to 16-123-109 (Michie Supp. 1993). She premised her damages claim upon theories of hostile work environment sexual harassment and constructive discharge. The jury found in Henderson's favor on both claims and awarded her damages. Following the jury's award of damages, Simmons filed a motion for judgment

---

[3]Claims premised under the Arkansas Civil Rights Act of 1993 are analyzed in the same manner as Title VII claims. See Ark. Code Ann. § 16-123-103(c).

as a matter of law pursuant to Federal Rule of Civil Procedure 50, a motion for a new trial pursuant to Federal Rule of Civil Procedure 59, and a motion for remittitur. The district court denied all three motions. Henderson filed a motion for attorneys' fees, which the district court granted. Simmons appeals the district court's decision on all four motions.

## II.
### Discussion

### A. Judgment as a Matter of Law

Simmons argues that the district court erred when it denied its posttrial Rule 50 motion for judgment as a matter of law. Rule 50 permits a district court to grant judgment as a matter of law to a moving party following a trial if the district court finds that the nonmoving party "has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). We review the denial of a Rule 50 motion de novo. See Hathaway v. Runyon, 132 F.3d 1214, 1221 (8th Cir. 1997).

A party seeking to overturn a jury verdict based on the insufficiency of the evidence faces an onerous burden. See United States v. Big D Enterprises, Inc., 184 F.3d 924, 929 (8th Cir.1999), cert. denied, 120 S. Ct. 1419 (2000). "Judgment as a matter of law is proper '[o]nly when there is a complete absence of probative facts to support the conclusion reached' so that no reasonable juror could have found for the nonmoving party." Hathaway, 132 F.3d at 1220 (quoting Lavender v. Kurn, 327 U.S. 645, 653 (1946)) (alterations in original). In evaluating a Rule 50 motion, the trial court must "assume as proven all facts that the nonmoving party's evidence tended to show, give her the benefit of all reasonable inferences, and assume that all conflicts in the evidence were resolved in her favor." Id. The absence of a bright line between actionable sexual harassment and nonactionable, unpleasant conduct generally will

serve to defeat a Rule 50 motion premised upon the sufficiency of the evidence. See id. at 1221; see also Rorie v. UPS, Inc., 151 F.3d 757, 762 (8th Cir. 1998) ("While we concede that the facts of this case are on the borderline of those sufficient to support a claim of sexual harassment, we cannot say that a supervisor who pats a female employee on the back, brushes up against her, and tells her that she smells good does not constitute sexual harassment as a matter of law"). In this case, there is more than sufficient evidence to support the jury's verdict in regard to both the sexual harassment and constructive discharge claims.

**1. Sexual Harassment**

Henderson argued to the jury that she suffered sexual harassment due to exposure to a hostile work environment. Title VII forbids sexual harassment in the workplace and imposes liability upon employers who tolerate a hostile work environment. See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66 (1986). A plaintiff asserting a hostile work environment claim must show (1) membership in a protected group or class, (2) unwelcome sexual harassment (3) based upon gender (4) resulting in an effect on a term, condition, or privilege of employment, and (5) that the employer knew or should have known about the harassment and failed to take proper remedial action. See Staton v. Maries County, 868 F.2d 996, 998 (8th Cir. 1989). In addition, the plaintiff must show that the sexual harassment created an environment that was both objectively and subjectively abusive. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Simmons argues that Sanchez's harassment lacked the frequency or severity required to constitute an objectively hostile work environment. Simmons is mistaken. Taking the evidence in a light most favorable to the jury's verdict, we conclude that Henderson easily demonstrated the existence of an objectively and subjectively hostile work environment. Sanchez harassed Henderson almost continuously from 1994 to 1995, and throughout 1997. He reviled her with a barrage of sexual vulgarities and

taunted her with a cannonade of perverted anatomical traducements. He also groped her. On one occasion, he rubbed his pelvis up against her backside. On another occasion, he shoved a broom handle into the crotch area between her legs. Sanchez's conduct was outrageous and occurred with such severity and frequency that we have no difficulty concluding that it created an objectively hostile work environment for Ms. Henderson.

Sanchez created an intolerably abusive working climate, and Simmons did little to ameliorate the abuse. Simmons took no action when Henderson first complained about Sanchez in 1994. Although Sanchez did spend about a year and a half away from Henderson because he worked a different shift, Simmons then reassigned him to work a few feet away from her. Simmons knew about the prior allegations of sexual harassment, and the company took no corrective action when Henderson asked Simmons to move Sanchez. Simmons attempted to justify its actions by indicating that it had only one available work station. Such a justification is untenable because the record indicates that each division contained eight lines with 20 workers per line.

When Sanchez's behavior became even more intolerable, Simmons reacted in a half-hearted manner. One supervisor threatened the victim with possible termination. Simmons investigated the sexual harassment allegations only after Henderson voiced her complaints to the company nurse. The investigation, however, was hardly a textbook model of competent and efficient responsiveness. The supervisors interviewed three non-English speaking employees without the aid of an interpreter. They made no attempt to find an interpreter, even when it became clear that a key witness, Dittavong, could not understand the basic components of his supervisors' questions. The supervisors did threaten Sanchez with the loss of his job, and this threat apparently curbed Sanchez's verbal harassment of Henderson. It did not, however, dissuade Sanchez from targeting lewd gestures at Henderson and rubbing up against her. When Henderson once again reported the incidents of sexual harassment, her supervisors at Simmons took no action. Based upon the evidence presented at trial,

there is far from a dearth of evidence to support Henderson's sexual harassment claims. On the contrary, more than sufficient evidence of a hostile work environment was laid before the jury, and while Simmons made some attempt to remedy the situation, the record is replete with instances where Simmons took no action. In fact, when viewed as a whole, it is quite clear that Simmons failed to remedy the hostile environment it allowed Sanchez to create. Accordingly, Simmons's challenge to the sufficiency of the evidence regarding the hostile work environment claim fails.

**2. Constructive Discharge**

Simmons also challenges the jury's finding regarding Henderson's claim of constructive discharge. A constructive discharge occurs when an employer, through action or inaction, renders an employee's working conditions so intolerable that the employee essentially is forced to terminate her employment. See Kimzey v. Wal-Mart Stores, 107 F.3d 568, 574 (8th Cir. 1997). "If an employee quits because she reasonably believes there is no chance of fair treatment, there has been a constructive discharge." Id. (citing Winbush v. State of Iowa by Glenwood State Hosp., 66 F.3d 1471, 1485 (8th Cir. 1995)). An employee must, however, grant her employer a reasonable opportunity to correct the intolerable condition before she terminates her employment. See West v. Marion Merrell Dow, Inc., 54 F.3d 493, 498 (8th Cir. 1995). Simmons argues that there can be no constructive discharge as a matter of law because Henderson resigned after a three-week vacation and three months after the cessation of the harassing behavior. Simmons's position is supported by neither the facts nor the law.

The fact that Henderson resigned from Simmons after a three-week vacation is irrelevant. With regard to Simmons's second argument, Henderson claims that the harassment did not cease when Higginbotham spoke to Sanchez but instead continued until she tendered her resignation. The jury obviously accepted Henderson's version of events. Taking the evidence in a light most favorable to the verdict requires us to

conclude that Henderson proved her constructive discharge claim. Simmons's half-hearted responses to Henderson's complaints, Simmons's threat against Henderson's job, Simmons's poorly conducted investigation, Simmons's failure to transfer either Henderson or Sanchez, and Simmons's failure to respond to Sanchez's lewd gestures toward Henderson certainly demonstrates the existence of an intolerable working environment where an employee essentially is left with no choice other than the termination of her employment. In addition, Henderson afforded her employer more than sufficient time to correct the intolerable conditions. Only after enduring months of abusive sexual harassment did Henderson tender her resignation. Hence, under the facts and circumstances of this case, we must conclude that Henderson met the requirements for proving a claim of constructive discharge.

**3. Mitigation of Damages**

Simmons argues that the jury erred as a matter of law when it awarded Henderson $15,000 in back pay. Simmons contends that Henderson did not mitigate her damages by seeking employment in the poultry industry. Accordingly, claims Simmons, the district court should have reduced or set aside the jury's verdict awarding Henderson back pay.

A wrongfully discharged employee has a duty to attempt to mitigate her damages. See Denesha v. Farmers Ins. Exch., 161 F.3d 491, 502 (8th Cir. 1998), cert. denied, 119 S. Ct. 1763 (1999). The duty to mitigate "requires that the plaintiff use reasonable diligence in finding suitable employment and not refuse a position substantially equivalent to the one at issue. The defendant bears the burden of showing that there were suitable positions and that the plaintiff failed to use reasonable care in seeking them." Id. (internal citation omitted). Although the duty imposed upon the plaintiff is one of reasonable diligence in seeking new employment, the law imposes no requirement that her attempts yield success. See id.

Henderson exercised reasonable diligence in this case. Although she did not specifically seek further employment in the poultry industry, she did try to obtain numerous positions commensurate with her education and skill levels. Simmons has proffered no evidence that Henderson refused a position that was substantially similar to her previous employment or that she failed to use reasonable care in obtaining a suitable position. Hence, Simmons's mitigation of damages challenge fails, and we affirm the jury's award of back pay.[4]

## B. Punitive Damages

Simmons argues that the district court erred when it allowed the jury to consider the issue of punitive damages. Simmons contends that Henderson failed to meet the standard required for a punitive damages award. Hence, argues Simmons, the district court should have granted the company judgment as a matter of law in regard to the punitive damages or, at the very least, should have granted Simmons's motion to remit the punitive damages award. We review a district court's legal conclusions regarding punitive damages de novo. See Big D Enterprises, 184 F.3d at 932-33.

Federal law imposes a formidable burden on plaintiffs who seek punitive damages in a hostile work environment action premised under Title VII. An employee seeking punitive damages from an employer as a result of sexual harassment perpetrated by a fellow employee must show that the employer acted with actual malice or deliberate indifference to her federally protected right. See Varner v. Nat'l Super Markets, Inc., 94 F.3d 1209, 1214 (8th Cir. 1996), cert. denied, 519 U.S. 1110 (1997); 42 U.S.C. § 1981a(b)(1). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad v. American Dental Ass'n,

---

[4]We also conclude that the district court committed no error in denying Simmons's Rule 59 motion.

119 S. Ct. 2118, 2124 (1999); see also, Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 987-88 (8th Cir. 1999). In this case, Henderson has met the high standard needed to justify an award of punitive damages.

At the outset, we note that there is no evidence that Simmons acted with actual malice. Hence, our inquiry must focus on whether Simmons's actions amount to deliberate indifference. Simmons argues that Henderson has fallen woefully short of proving that it acted with deliberate indifference to her federally protected rights. Simmons cites Varner for the proposition that this court has declined to find deliberate indifference in circumstances where the facts at issue were far more egregious than the facts of the instant case. Simmons's reliance on Varner is misplaced.

In Varner, a 51-year-old male employee of National Super Markets, Inc. taunted a 17-year-old female coworker, Lisa Anne Varner, with graphic sexual remarks over the course of several weeks in the spring of 1991. See 94 F.3d at 1211. On two separate instances in July of 1991 and November of 1991, the male employee sexually assaulted Varner. Varner never complained to her supervisor after the assaults but instead told her fiancé who also was a National Super Markets employee. Varner's fiancé complained to Varner's supervisor once after the July assault and once after the November assault. On both occasions, the supervisor ignored the complaints. See id. The supervisor stated that pursuant to company policy, he could not act unless Varner personally complained to him. See id. National Super Markets' sexual harassment policy directed supervisors not to address sexual harassment complaints themselves but to refer aggrieved employees to the company's Human Relations Department. See id. at 1213-14. We concluded that although Varner's fiancé's complaints sufficiently placed the company on notice for liability purposes, the facts as a whole did not demonstrate deliberate indifference. Hence, we held that the district court properly declined to submit the issue of punitive damages to the jury. See id. at 1214.

Varner presents a sharp contrast to the facts of the instant case. Unlike the plaintiff in Varner, Henderson personally voiced over 40 complaints to her supervisors. (See Trial Tr. at 24.) Rather than direct her complaints to one particular supervisor, Henderson reported the incidents of verbal abuse and sexual assault to several individuals who held supervisory roles at Simmons. (See id. at 22-27). The company acted upon Henderson's complaints only once in two years, and we have previously noted that Simmons's response at best can be characterized as half-hearted. In addition, the supervisors at Simmons actually impeded Henderson's attempts to gain relief.

In 1997 Simmons placed Sanchez in close proximity to Henderson despite the company's awareness of Sanchez's sexual harassment and despite the availability of positions on other food craft lines. The company then ignored Henderson's requests for a transfer, and it refused to transfer Sanchez. (See id. at 26.) The supervisors turned a deaf ear to Henderson's report that Sanchez stuck a broom handle into her crotch area. (See id.) When Henderson continued to voice complaints about Sanchez's verbal and physical abuse, the company threatened her with the loss of her job. Simmons also told Henderson that it would not act unless she found witnesses to corroborate her story. (See id. at 27.)

Taken together, the facts of this case demonstrate that Simmons deliberately downplayed Henderson's sexual harassment complaints and, moreover, actually contributed to the escalation of a hostile work environment by its reassignment of Sanchez. We conclude therefore that Simmons, through its supervisors' conduct, displayed deliberate indifference to Henderson's federally protected rights. Such evidence of deliberate indifference supports an award of punitive damages. In addition, we conclude that the punitive damages award in this case is not excessive in relation to the compensatory damage award and that Simmons's conduct was sufficiently reprehensible to justify the amount of punitive damages awarded in this case. See BMW of North Am. v. Gore, 517 U.S. 559, 575, 582-84 (1996) (discussing the

standard for evaluating punitive damages awards); <u>Big D Enterprises</u>, 184 F.3d at 933 (same). Accordingly, the punitive damages award stands.

## C. Attorneys' Fees

Simmons argues that the district court erred when it awarded Henderson $28,845 in attorneys' fees. The company contends that the award should be commensurate with Henderson's overall success in the litigation. We will disturb a district court's decision to award attorneys' fees only if we find an abuse of discretion. <u>See</u> <u>American Fed'n of Musicians v. St. Louis Symphony Soc'y</u>, 203 F.3d 1079, 1081 (8th Cir. 2000).

In this case, the district court thoroughly analyzed its bases for the attorneys' fees award. We are persuaded by the district court's well-reasoned opinion. In addition, it is apparent that Henderson substantially prevailed in this litigation. Accordingly, we affirm the district court's award of attorneys' fees.[5]

---

[5]Simmons also raises claims that were not presented to the district court. We decline to address arguments raised for the first time on appeal. <u>See</u> <u>United Waste Sys. of Iowa, Inc. v. Wilson</u>, 189 F.3d 762, 768 n.4 (8th Cir. 1999).

## III.
## Conclusion

For the reasons stated above, we affirm the judgment of the district court.


A true copy.

   Attest:


         CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.