216 F.Supp.2d 940 (2002)
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,
v.
CHEMSICO, INC. and United Industries Corp. d/b/a Spectrum Brands Mfg., Defendants.
No. 4:01CV00156 ERW.
United States District Court, E.D. Missouri, Eastern Division.
May 7, 2002.
*941 *942 Robert G. Johnson, Barbara A. Seely, Donna L. Harper, Gwendolyn Young Reams, Anne E. Gussewelle, St. Louis, MO, for Plaintiff.
Robert W. Stewart, Partner, William M. Lawson, McMahon and Berger, St. Louis, MO, for Defendants.

MEMORANDUM AND ORDER
WEBBER, District Judge.
This matter is before the Court upon Defendants' Motion for Summary Judgment [doc. # 40]. Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), filed a Complaint on behalf of Ms. Catrice Brown on January 31, 2001. Plaintiff alleges that Defendants discriminated against Ms. Brown on the basis of her religion by refusing to accommodate her religious beliefs and by discharging her in violation of Title VII of the Civil Rights Act of 1964. Defendants move for summary judgment, arguing that Plaintiff has failed to set forth sufficient evidence of all elements of the religious discrimination claim. Defendants also contend that there is no evidence to support a submissible case of punitive damages.

I. BACKGROUND FACTS
Drawing all inferences in Plaintiff's favor, the Court sets forth the following background facts.

A. Ms. Brown's Religious Beliefs
Ms. Brown claims she is a member of the Church of God, International, which was founded by Garner Ted Armstrong in 1978. It is a Christian religious organization, advocating that the Bible is the divinely inspired Word of God. William Faith was the minister of the St. Louis division of the Church of God, International from 1985 until 1996. It is undisputed that Mr. Faith resigned from the Church of God, International in 1996, and he has not been Ms. Brown's minister since that time. He left to form the Church of God, Sabbatarian. Garner Ted Armstrong also left the Church of God, International to form the Intercontinental Church of God. Most of the former members of the Church of God, International in St. Louis have joined with the Church of God, Sabbatarian or the Intercontinental Church of God. In approximately 1999, the Church of God, International ceased having any formal presence in St. Louis.
Mr. Faith testified that although he is no longer a member of the Church of God, International, the beliefs of the church are that persons are not supposed to work on the Sabbath, which is sundown Friday to sundown Saturday. Members are supposed to honor God by assembling, attending church, or engaging in Bible study on the Sabbath, unless they are sick or have another valid reason. Sex outside of marriage is a sin and a violation of the teachings of the Church of God, International. Ms. Brown similarly states that members of her religion observe the Sabbath, a day of rest, from sundown Friday until sundown Saturday.[1] They are generally expected to attend services on the Sabbath; however, alternatively, they recognize that Bible study is another way of honoring God on the Sabbath. In addition, members of her religion are not supposed to work on various other Holy days, including the Day of Atonement, the Feast of Tabernacles, *943 the Last Great Day, Passover, the Day of Unleavened Bread, Pentecost, and the Feast of Trumpets. They are encouraged to travel out of town to attend Holy day feasts, although it may be a matter of personal choice whether they attend or not. Ms. Brown asserts that the doctrines and teachings of the Church of God, International and the Church of God, Sabbatarian are the same in that both religious groups refrain from working on the Sabbath.
Ms. Brown's parents were members of the World Wide Church of God from 1979 to 1982. In approximately 1982, when Ms. Brown was seven years old, her parents became members of the Church of God, International. She attended services in that faith until the mid-1990s. Ms. Brown represented that she attended services once a week and that Mr. Faith was the minister at her church. She admitted in her deposition, however, that she has not attended church services regularly since 1997 and that she did not attend church regularly in 1995 or 1996. According to Mr. Faith, Ms. Brown had not attended church regularly since 1989.
At the time Ms. Brown ceased attending church on a regular basis, Mr. Faith was the minister of the Church of God, International. She had no contact with Mr. Faith after she ceased attending services. Ms. Brown states that in the mid-1990s, her mother began conducting Bible study in her home on the Sabbath, and Ms. Brown participated in the Bible study as opposed to going to church. She also studies the Bible at home and reads religious publications. She listens to religious tape recordings and considers herself a member of the Church of God, International.
Ms. Brown stated in her deposition testimony that she has always observed the Sabbath and has never worked on the Sabbath in any job in which she has been employed. During 1998, Ms. Brown worked on the Holy day of Unleavened Bread (April 11-17, 1998). She volunteered and worked on Pentecost, which fell on Sunday, May 31, 1998. Ms. Brown has a son and has never been married, which finding is relevant only as it relates to Ms. Brown's acknowledged church doctrine.

B. Defendants' Operations
Defendants package, market, and sell household aerosol and liquid products. Defendants employ regular full-time employees who are members of a bargaining unit represented by Local 980 of the Allied Industrial Painters and Finishers. In addition to utilizing regular full-time employees, Defendants employ "casual" full-time employees. The Production Supervisor determines the number of casual employees to be utilized on a day-to-day basis. He then advises the staffing coordinator, who is a bargaining unit employee, of the number of temporary employees needed, and the staffing coordinator works directly with the temporary agency in an effort to meet Defendants' needs. Defendants assert that casual employees are only utilized on week days, not during Saturday overtime, because they are less reliable, more expensive, and less skilled than regular employees. However, Plaintiff disputes the contention and states that temporary employees have been used on Saturdays in both production and the distribution center.
Casual employees are not governed by the terms of the Collective Bargaining Agreement and are not members of the Union. Rather, they are temporary employees hired through Spherion, a temporary agency. Upon initial hire, employees are casual employees, and after a probationary period the Production Supervisor and Packaging Manager make a decision as to whether the individual should be *944 promoted to the status of a regular full-time employee. Once the casual employee is promoted, the employee is subject to the Collective Bargaining Agreement.
The Collective Bargaining Agreement provides for a "no-fault attendance policy." Points are assessed depending upon the reason for the absence and whether or not the employee calls in to report the absence in a timely fashion. It provides for excused absences in the case of a work-related injury, jury duty, funeral, vacation, and union business. It also states that a doctor or dentist appointment will qualify as an excused absence if the employee provides notice three days in advance and verifies the appointment was kept. The attendance policy also provides that "an employee who completes a 13-week period without being assessed any points and who worked all scheduled hours will earn six (6) hours of pay and four (4) hours of time off. An employee may take off such earned time by making a request for such paid time off three (3) days in advance. If the Company permits such time off, then no points will be assessed."
For absences other than qualified excused absences, employees accumulate attendance points. The accumulation of points is made during a thirteen week period. At the end of the period, if the employee worked all scheduled hours the point total is reduced to zero. For each four week period during which an employee works all scheduled hours, the point total is reduced by one-third. The first occurrence of points in each calendar quarter is "free," so that no points are assessed.
The Collective Bargaining Agreement provides for mandatory overtime. Notice of overtime for the sixth day of the work week is given on the fourth work day; notice of overtime for the seventh day of the work week is given on the fifth work day. Employees who refuse to work overtime are assessed two points for each hour of overtime not worked unless the employee gives notice of the inability to work overtime on the third day of the work week. In such cases, the employee is assessed one point for each hour of overtime not worked.
When an employee accumulates seven attendance points, a written reprimand is issued. A second written reprimand is issued after nine points, and a third is issued after thirteen points. After eighteen points are accumulated, a fourth written reprimand is issued, and the employee is terminated upon the accumulation of twenty-five points.

C. Ms. Brown's Employment History
Ms. Brown applied for employment with Defendants on January 2, 1998, when she spoke with Sandy Sullivan, a human resources representative. Ms. Sullivan told her that she would be working Monday through Friday, on first shift, and that she should report to Jean Winston. Ms. Brown claims, and Defendants deny, that Ms. Brown told Ms. Sullivan either that she could not work on Saturdays or that Ms. Sullivan made a response that although the company did have some mandatory Saturday shifts, it "shouldn't be a problem."
Defendants hired Ms. Brown as a casual employee on January 12, 1998. She worked as a line worker in Plant 1 and was supervised by Mark Ritchie, Packaging Manager for Defendants' Plant 1. Mr. Ritchie had the ultimate responsibility for personnel matters such as attendance, vacation, sick leave, discipline, and day-to-day operations in Plant 1. He was responsible for administering the Collective Bargaining Agreement. Ms. Brown asserts that she regarded Staffing Supervisor Jean Winston and Line Leader Patricia Minor as her supervisors; however, Defendants *945 dispute that Ms. Winston acted in a supervisory capacity. Ms. Brown also states that the Union Business Agent and the Union stewards shared responsibility for administering the Collective Bargaining Agreement.
Some time prior to February 14, 1998, Ms. Brown learned by word-of-mouth and a posting notice that Defendants had scheduled mandatory overtime for Saturday, February 14, 1998. She told Ms. Winston that due to her religion, she could not work Saturdays. Ms. Winston advised Ms. Brown that she should get a letter from her church indicating that she could not work Saturdays and that she should talk to Mr. Ritchie about the conflict. Ms. Brown states that she called her father, Mathew Brown, and asked him to get a letter from the church. Subsequently, Ms. Brown's mother and sister delivered a letter to her dated February 7, 1998, with Mr. Faith's name on it. The letter explained that Church of God, International members observe the Sabbath on Saturday. Ms. Brown gave the letter to Ms. Winston, believing that her father had received it from Mr. Faith.
Ms. Brown spoke with Mr. Ritchie some time before the scheduled mandatory overtime period and informed him that she could not work on Saturdays due to her religion. Ms. Brown claims that she told Mr. Ritchie she had already brought a letter from the church, but Mr. Ritchie stated he had not received it. Ms. Brown indicated that she would get another note from her church. Ms. Brown telephoned her father and asked for another letter. Ms. Brown's mother delivered the second letter, dated February 11, 1998. As with the first letter, Ms. Brown believed that her father had gotten the second letter from Mr. Faith.[2]
The following day Ms. Brown met with Mr. Ritchie again and provided him with an unsigned letter on Church of God, International letterhead. The letter was dated February 11, 1998, and contained a signature block for William C. Faith, Minister. Ms. Brown testified in her deposition that Mr. Ritchie advised her that the Saturday overtime was mandatory. She also testified that he stated he had "a business to conduct" and if he let her off on Saturday, everyone would want to be excused from Saturday overtime. Mr. Ritchie told Ms. Brown that due to production needs, the ability to work Saturdays was a condition of employment and she could be subject to disciplinary actions if she did not work the mandatory overtime. Mr. Ritchie placed the letter in Ms. Brown's personnel file, where it remained.
Ms. Brown did not work the mandatory overtime period scheduled for Saturday, February 14, 1998. Defendants assert that Ms. Brown was not disciplined for her absence on February 14, 1998, because she was a casual employee at the time and was *946 therefore not covered by the Collective Bargaining Agreement. Ms. Brown states, however, that Mr. Ritchie had the authority at that time to discharge or discipline her for her absence.
On April 13, 1998, Ms. Brown was promoted to the status of regular full-time employee. She completed a union membership form and became a bargaining unit employee covered by the Collective Bargaining Agreement. She testified in her deposition that she does not know if she received a copy of the Collective Bargaining Agreement, and no one ever explained its provisions to her regarding vacations, personal holidays, or shift changes.
From April through July 1998, Ms. Brown was absent from work several times and was assessed attendance points. On April 14, 1998, Ms. Brown was late for work; however, by error, no points were assessed. On May 5, 1998, Ms. Brown was again late for work. Ms. Brown used her "free occurrence" for that calendar quarter and no points were therefore assessed against her. Ms. Brown notified Defendants that she would be absent from work on May 19, 1998, and she was assessed three points. On June 19, 1998, she was again absent, but was assessed no points because she used her free quarterly occurrence. Ms. Brown left work early on June 24, 1998, and was assessed two points. On June 26, 1998, Ms. Brown was absent to attend her grandmother's funeral. The absence was an excused absence and she was assessed no points. She was also absent on June 29, 1998 for personal leave, and was assessed one point. She called in to provide notice of an absence on July 8, 1998, and was assessed three points. At that time her point total was nine points. She was issued a written warning for exceeding seven points on July 16, 1998.
On July 21, 1998, Ms. Brown was assessed one point for being late for work. She left early on August 5, 1998, and was assessed two points. One point was assessed on August 7, 1998, for being late. Some time prior to August 11, 1998, Ms. Brown notified Ms. Winston that she desired to be off work on August 11, 1998, but did not want to accumulate any points. Ms. Winston advised that the Collective Bargaining Agreement provided for one personal holiday each contract year,[3] and she could use the personal holiday to be absent without being assessed any points. Ms. Brown used her personal holiday, and was therefore absent on August 11, 1998 without accumulating any points.
On August 13, 1998, Ms. Brown applied for an unpaid leave of absence for personal reasons. She was in fact suffering from stomach cramps, which later turned out to be a miscarriage. On August 14, 1998, Ms. Brown was issued a second written warning for exceeding thirteen attendance points. Ms. Brown's request for leave of absence was granted and she was allowed a leave of absence from August 17, 1998 through November 16, 1998. Ms. Brown did not return to active work until January 25, 1999. She states that she returned to work when she was physically capable. While on the leave of absence, she took a course in phlebotomy at Walbridge Educational Community Center.
Ms. Brown did not contact Defendants until January 1999 regarding her desire to return to work. She was advised on January 14, 1999, that she was to return to work from her leave of absence on Monday, *947 January 25, 1999. She was to report to Ms. Winston for her assignment. Ms. Brown was aware at that time that she had already accumulated thirteen attendance points.
On Thursday January 28, 1999, Ms. Brown was advised that Saturday, January 30, 1999, was scheduled as mandatory overtime. She informed her line leader, Ms. Minor, a non-supervisory bargaining unit employee, that she could not work Saturday because it was her religious Sabbath. Ms. Minor advised her that the overtime was mandatory and that Ms. Brown should talk to Ms. Winston. Ms. Winston told Ms. Brown to speak with Mr. Ritchie. Ms. Brown stated in her deposition that she informed Ms. Minor, Ms. Winston, and Mr. Ritchie that she could not work Saturday because of her religion.[4] Ms. Minor testified that Ms. Brown told her she spoke with Mr. Ritchie about not working the Saturday shift. It is disputed and unclear whether she spoke with Mr. Ritchie before or after January 30, 1999. It is also disputed whether he knew that her inability to work was due to her religion. However, it is undisputed that Mr. Ritchie knew in advance that Ms. Brown would not work on January 30, 1999.
Mr. Ritchie did not take any action to replace Ms. Brown on the production line for January 30, 1999. He had the authority to hire temporary employees to work Saturdays in production, although that was rarely done. Usually when a person called in sick for a Saturday overtime schedule, volunteers were used or the line ran short. Roger Pierre, Shift Supervisor in Plant 1, testified that he has never shut down a line because a particular employee could not work overtime on a Saturday.
Ms. Brown did not work on January 30, 1999, and did not call in to report her absence. She did not use a personal holiday, although at the time of her absence a personal holiday was available under the Collective Bargaining Agreement.[5] She testified that she did not know she was entitled to another personal holiday. She was assessed two points per hour for each hour she missed, totaling sixteen points. At that time, Ms. Brown had accumulated twenty-nine points.[6] It is undisputed that other than Ms. Brown's absence of January 30, 1999, none of the points assessed were related to her religion. Even in her absence, production on January 30, 1999, exceeded scheduled production in Plant 1.
At no time did Mr. Ritchie make suggestions to Ms. Brown about how she could avoid getting attendance points for not working Saturdays, even though he identified several possible options during his deposition testimony. He also never *948 talked to any representative from the Union about varying the terms of the Collective Bargaining Agreement to excuse Ms. Brown from Saturday work. The Union Business Representative testified that if Defendants had allowed Ms. Brown to miss mandatory overtime on a Saturday due to her religion, many other employees would have submitted fake notes related to religious obligation to avoid Saturday work. He also testified that receipt of three to four fake notes on any given Saturday is expected. In addition, he testified that if he had been contacted by Mr. Ritchie to discuss the possibility of not terminating Ms. Brown, the Union may have been willing to try to vary the attendance policy to accommodate Ms. Brown's religious beliefs.[7]
On February 4, 1999, Mr. Ritchie, the Shop Steward, and the Production Supervisor advised Ms. Brown that she was terminated because she had exceeded twenty-five points. Ms. Brown complained of religious discrimination during her termination meeting.[8] Accordingly, Rebeckah Long, a Human Resources Generalist for Defendants, conducted an investigation. She spoke with Mr. Ritchie, looked at Ms. Brown's time sheets, and reviewed religious discrimination case law provided to her as a member of the AAIM Management Association.[9] She does not recall whether she asked Mr. Ritchie if he made any attempt to accommodate Ms. Brown's religious beliefs. Ms. Long found that Ms. Brown was assessed points pursuant to the Collective Bargaining Agreement and terminated for exceeding the number of points allowed. She determined that Ms. Brown was not discriminated against because accommodating her religious beliefs would require the employer "to bear more than a minimal cost or to violate a valid seniority system or Collective Bargaining Agreement," creating an undue hardship. Ms. Brown did not file a grievance based upon the termination.

II. SUMMARY JUDGMENT STANDARD
Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Dammen v. UniMed Medical Center, 236 F.3d 978, 980 (8th Cir.2001) (citations omitted) (stating that "summary judgment will be granted if `the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law'"). The United States Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to `secure the just, speedy and inexpensive determination of every action.'" Celotex, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).
"By its terms, [Rule 56(c)(1)] provides that the mere existence of some alleged factual dispute between the parties will not *949 defeat an otherwise properly supported motion for judgment; the requirement is that there be no genuine issue of material fact." Hufsmith v. Weaver, 817 F.2d 455, 460 n. 7 (8th Cir.1987) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis added by Supreme Court)). Material facts are "those `that might affect the outcome of the suit under the governing law....'" A genuine material fact is one such that "`a reasonable jury could return a verdict for the nonmoving party.'" Id. Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, ... there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23, 106 S.Ct. 2548.
The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988). The burden then shifts to the nonmoving party who must set forth specific evidence showing that there is a genuine dispute as to material issues. Anderson, 477 U.S. at 249, 106 S.Ct. 2505. To meet its burden, the non-moving party may not rest on the pleadings alone and must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
In analyzing summary judgment motions, the court must view the evidence in the light most favorable to the non-moving party. Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 775 (8th Cir.1995). The non-moving party is given the benefit of any inferences that can logically be drawn from those facts. Matsushita, 475 U.S. at 586, 106 S.Ct. 1348. The court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." Kampouris v. St. Louis Symphony Soc., 210 F.3d 845, 847 (8th Cir.2000). The court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." Id.

III. DISCUSSION
Under Title VII, it is unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion." 42 U.S.C. § 2000e-2(a)(1), cited in Vetter v. Farmland Indus., Inc., 120 F.3d 749, 751 n. 3 (8th Cir.1997). Religion is defined as "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j), quoted in Vetter, 120 F.3d at 751 n. 3. An employer must provide a reasonable accommodation to an employee's religion unless the "employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." Id. To survive a motion for summary judgment on a claim of religious discrimination, a plaintiff must set forth specific evidence demonstrating that (1) the employee had a bona fide religious belief that conflicted with an employment requirement, (2) the employee informed the employer about the belief, and (3) the employee was discharged for failing to comply with the employment requirement. See Wilson v. U.S. *950 West Communications, 58 F.3d 1337, 1340 (8th Cir.1995), cited in Seaworth v. Pearson, 203 F.3d 1056, 1057 (8th Cir.2000); Vetter, 120 F.3d at 751. If the plaintiff sets forth a prima facie case, "the burden shifts to the employer to show that accommodation would result in undue hardship." Seaworth, 203 F.3d at 1057.
For summary judgment, Defendants argue that Plaintiff has failed to set forth evidence creating a genuine dispute as to the first and second elements of the prima facie case. Defendants state that Ms. Brown cannot prove she had a bona fide religious belief and she cannot demonstrate that she notified Defendants of the conflict between her belief and the mandatory Saturday overtime. For purposes of summary judgment, Defendants do not dispute that Ms. Brown was terminated because of her failure to work the mandatory overtime on Saturday, January 30, 1999.[10] Should the Court find that Plaintiff has set forth a prima facie case, Defendants argue that they have met their burden of reasonably accommodating Ms. Brown's religious beliefs, and summary judgment in Defendants' favor is therefore warranted. Defendants also argue that there is no evidence to support a submissible case of punitive damages.

A. Bona Fide Religious Belief
Defendants contend that they are entitled to judgment as a matter of law because Plaintiff cannot demonstrate that Ms. Brown had a bona fide religious belief preventing her from working on Saturdays. Defendants assert that any belief against working on Saturdays was not "sincerely held" by Ms. Brown.[11] As proof that Plaintiff did not sincerely believe in and follow the teachings of the Church of God, International, Defendants point to Ms. Brown's failure to attend regular church services, her inaccurate statement that the Sabbath begins at sunup on Saturday as opposed to sundown on Friday, her failure to observe the prohibition on work during Holy days, and her child's birth out of wedlock. No one advocates nor challenges the proposition that adopting any particular religious belief is itself a guarantee that the adherent will never fall below the vows of the order.
The record indicates that Ms. Brown has never worked on a Saturday at any job. It is also undisputed that Ms. Brown engaged in Bible study at her mother's house after she stopped attending regular church services in the mid-1990s. A jury could conclude that Ms. Brown held sincere religious beliefs that prevented her from working on Saturdays even in light of the apparent failure to follow all the teachings of the Church of God, International, as referenced by Defendants. See, e.g., Vetter, 120 F.3d at 753 (reversing the grant of a directed verdict where reasonable inferences could be drawn that the employer's residency requirement interfered with the plaintiff's sincerely held religious beliefs as opposed to a mere personal preference to live elsewhere); Weber v. Leaseway Dedicated Logistics, Inc., 5 F.Supp.2d 1219, 1222 (D.Kan.1998), aff'd 166 F.3d 1223 (10th Cir.1999) (finding that plaintiff's belief that a social security number is the "mark of the beast" and his surrender of *951 his social security number was sufficient to create a genuine issue of material fact whether he had a bona fide religious belief prohibiting the use of a social security number). The Court finds that a genuine dispute as to whether Ms. Brown had a sincere religious belief precluding Saturday work exists. Therefore, Plaintiff has sufficiently set forth evidence of the first element of the prima facie case for unlawful religious discrimination, and summary judgment cannot be granted on this point.

B. Notice to Employer
The second element of a prima facie case of religious discrimination requires a plaintiff to set forth evidence showing that she informed her employer of the conflict between her religious beliefs and an employment requirement. See Johnson v. Angelica Unif. Group, Inc., 762 F.2d 671, 673 (8th Cir.1985) (finding that the plaintiff "clearly did not satisfy the notice element of the prima facie requirements" where she did not notify her employer of her inability to work on Holy days until after she had missed twelve days of work). Defendants argue that Plaintiff has failed to set forth any evidence demonstrating that Ms. Brown properly informed Defendants of the conflict between her religious belief and the mandatory overtime scheduled for Saturday, January 30, 1999. Defendants focus on the fact that the letters provided to Mr. Ritchie were not authorized by Mr. Faith even though they contained his signature block. Defendants state "that to allow Plaintiff to rely upon a falsified ... or fraudulently prepared document to satisfy the second element of a prima facie case is both illogical and inequitable" because it would encourage employees to submit falsified documentation to employers.
The undisputed facts show that Ms. Brown personally told her supervisor, Mr. Ritchie, about her religious conflict with working on Saturdays in February 1998, prior to the first scheduled Saturday overtime period.[12] At that time, she provided a letter, which she believed to be properly prepared, to Mr. Ritchie. It is undisputed that he placed the letter in her personnel file, and it has remained there to this date. There is no evidence that he had any reason to believe that the letter did not properly certify her religious beliefs regarding work on her Sabbath. It follows that regardless of whether the letter was in fact falsified and regardless of whether Mr. Ritchie was personally notified of the conflict when it arose again in January 1999, Mr. Ritchie had sufficient notice of Ms. Brown's religious conflict with Saturday work. See Mann v. Frank, 795 F.Supp. 1438, 1450 (W.D.Mo.1992), aff'd 7 F.3d 1365 (8th Cir.1993) (stating that "there is no question that plaintiff notified [her employer] about her religious tenets which required that she refrain from secular work on her Sabbath" where the plaintiff had written a letter stating the tenets of her church accompanied by a letter from the President of her congregation certifying her religious beliefs shortly after she was employed).
It is additionally undisputed that Ms. Brown advised both Ms. Winston and Ms. Minor, whom she regarded as supervisors, of her religious conflict with the January 30, 1999 overtime. Moreover, it remains disputed whether Ms. Brown notified the human resources representative of her religious belief during her initial application for employment with Defendants and whether Mr. Ritchie was notified of the reason for her absence before or after she *952 missed work on January 30, 1999. For these reasons, the Court believes that Plaintiff has set forth sufficient evidence of the second element of her prima facie case to create a genuine dispute of material fact, and summary judgment is not appropriate.

C. Reasonable Accommodation and Undue Hardship
Under Title VII, an employer must "reasonably accommodate" an employee's religious beliefs unless doing so would cause an "undue hardship." 42 U.S.C. § 2000e(j). Once a plaintiff establishes a prima facie case of religious discrimination, it is the employer's burden to show reasonable accommodation or undue hardship. Seaworth, 203 F.3d at 1057 (citations omitted). "The determination of when the reasonable accommodation requirement has been met, and the circumstances under which a particular accommodation may cause undue hardship, must be made in the particular factual context of each case." Mann, 795 F.Supp. at 1449 (citing Anderson v. General Dynamics Convair Aerospace Div., 589 F.2d 397, 400 (9th Cir.1978)). Defendants argue that they are entitled to judgment as a matter of law even if Plaintiff has established a prima facie case because they reasonably accommodated Ms. Brown's religious beliefs. Further, Defendants argue that any additional accommodation would have caused an undue hardship.

1. Reasonable Accommodation
Defendants aver that the Collective Bargaining Agreement and the "no-fault" attendance policy contained in the Agreement reasonably accommodated Ms. Brown's religion because it allowed an employee to accumulate twenty-five points before being terminated. A reasonable accommodation of an employee's religious needs may exist where a collective bargaining agreement establishes a neutral way, such as a seniority system, to minimize the occasions when an employee would have to work on a day he or she prefers to have off. Mann, 795 F.Supp. at 1450 (citing Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977)); Johnson, 762 F.2d at 674. For instance, in Johnson v. Angelica Uniform Group, Inc., the collective bargaining agreement allowed an employee to miss sixteen days of work in a year before being terminated. There, the employee failed to notify the employer of her need to have certain religious holidays off and failed to "attempt to accommodate [her] own beliefs through the means already available." Therefore, the court believed that the collective bargaining agreement provided a reasonable accommodation, and no further accommodation was necessary. Johnson, 762 F.2d at 674. Likewise, in Mann v. Frank, the employee was unable to work Friday and Saturday shifts. Her employer granted requests to have Fridays and Saturdays off. However, the employee then signed up for a voluntary overtime. Mann, 795 F.Supp. at 1442-44. She was called to work overtime on several Friday nights. The employer succeeded in finding other employees to take her place at least five times; however, on one occasion its attempts to find a replacement failed and the plaintiff was required to work. In affirming the district court's judgment for the defendant, the Eighth Circuit stated that "[a]lthough the statutory burden to accommodate rests with the employer, the employee has a correlative duty to make a good faith attempt to satisfy her needs through means offered by the employer." Mann v. Frank, 795 F.Supp. 1438, 1450-51 (8th Cir.1993). The plaintiff there voluntarily signed up for overtime and the employer replaced her or made significant attempts to replace her on all occasions where her religion conflicted with the overtime. The plaintiff was only *953 terminated after the employer "had no choice" but to require plaintiff to work overtime on a Friday night. Therefore, the court found that a reasonable accommodation was provided, satisfying the employer's burden under Title VII. Id. at 1451.
In the present case, the record is unclear whether Mr. Ritchie was aware before or after January 30, 1999, that Ms. Brown's failure to work on the Saturday overtime was due to a religious conflict; however, as of February 1998 he knew of Ms. Brown's religious beliefs. There is no dispute that Mr. Ritchie knew prior to January 30, 1999, that Ms. Brown intended to miss work that Saturday and Ms. Winston and Ms. Minor were aware that Ms. Brown's stated reason for not working was her religion. In addition, the Saturday overtime was mandatory; Ms. Brown did not volunteer as the plaintiff did in Mann. Defendants did not make any efforts to find a replacement or inform Ms. Brown of other alternatives as was the case in Johnson. It is undisputed that Ms. Brown had a personal holiday available, and on a previous occasion, Ms. Winston had informed Ms. Brown that she could use the personal holiday to avoid accumulating points. It is also undisputed that Defendants failed to speak with the Union representatives about altering the provisions of the attendance policy to accommodate Ms. Brown's asserted religious conflict before either Saturday in which mandatory overtime was scheduled.
Although Defendants correctly state that an employer is not obligated to violate the terms of a collective bargaining agreement to accommodate an employee's religion, the burden remains on the employer to make an effort to resolve the conflict before terminating the employee. See Cook v. Chrysler Corp., 981 F.2d 336 (8th Cir.1992). Because it appears that Defendants took no other action whatsoever to accommodate Ms. Brown except for the imposed point system, the Court cannot conclude as a matter of law that based solely upon the existence of the neutral attendance point system, Defendants met their burden to provide a reasonable accommodation.

2. Undue Hardship
Defendants also argue that any further accommodation, beyond the attendance policy in the Collective Bargaining Agreement, would have posed an undue burden. Defendants argue that the only possible accommodations included either violating the Collective Bargaining Agreement or working at a decreased production efficiency. Defendants also argue that accommodating Ms. Brown would have resulted in other employees presenting false notes to be relieved of Saturday work due to their religions.
"[T]he extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship." See Weber v. Leaseway Dedicated Logistics, Inc., 5 F.Supp.2d 1219, 1223 (D.Kan.1998) (quoting Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 68-69, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986)). An employer is faced with an undue hardship "if the accommodation requires it to bear more than a de minimus burden." Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). "Requiring an employer to discriminate against some employees in order to enable others to observe their Sabbath is an undue hardship." Id., cited in Mann, 795 F.Supp. at 1452.
A Union representative testified in his deposition that had he been contacted, he may have been able to alter the Collective Bargaining Agreement to accommodate Ms. Brown. The record also demonstrates *954 that even though Mr. Ritchie knew Ms. Brown did not intend to work on January 30, 1999, he made no attempts to replace her and production actually exceeded expectations on that day. In other cases where employees missed Saturday work, Defendants used volunteers or merely worked the production line short-handed. Furthermore, it was always expected that several fake notes would be proffered. Based upon these facts, the Court concludes that Defendants have failed to meet their burden of demonstrating that as a matter of law, they would have suffered more than a de minimus hardship had they further accommodated Ms. Brown.

D. Punitive Damages
Plaintiff seeks punitive damages under Title VII. "`Federal law imposes a formidable burden on plaintiffs who seek punitive damages' in employment discrimination cases.'" Webner v. Titan Distrib., Inc., 267 F.3d 828, 838 (8th Cir.2001) (citing Henderson v. Simmons Foods, Inc., 217 F.3d 612, 618 (8th Cir.2000)). A plaintiff must show that the employer acted "`with malice or with reckless indifference' to the plaintiff's federally protected rights." Id. (citing Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)). "The terms `malice' or `reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Id. A plaintiff is not required to show "egregious misconduct"; however, vicarious liability will not be imposed for punitive damages where "the discriminatory actions of managerial agents were contrary to the employer's `good faith efforts to comply with Title VII.'" Madison v. IBP, Inc., 257 F.3d 780, 794-95 (8th Cir. 2001).
Defendants assert that Plaintiff is unable to make a submissible case on the issue of punitive damages. Defendants state there was no knowledge that the assessment of attendance points may be in violation of federal law and a proper investigation was conducted after Defendants became aware of Ms. Brown's allegation of religious discrimination. The record indicates, however, that Mr. Ritchie was likely aware of the prohibition against religious discrimination, but took no action to accommodate Ms. Brown. When first notified of her religious conflict, he stated that he "had a business to run" and the overtime was mandatory. There is a genuine dispute as to whether he took appropriate action to accommodate Ms. Brown. In the event this case is submitted to a jury for a Title VII claim, the Court shall determine based upon all of the evidence, whether Plaintiff successfully carried the very heavy burden to make a case for punitive damages. The Court is not persuaded at this time of the existence of sufficient facts to support such a claim, but at the same time, will not rule that Plaintiff, at this stage, will be foreclosed from submitting a claim for punitive damages.
Accordingly,
IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment [doc. # 40] is DENIED.
NOTES
[1] In her Charge of Discrimination, Ms. Brown represented that the Sabbath was from sunup to sundown Saturday. She admits that her initial representation was in error.
[2] While a minister of the Church of God, International, Mr. Faith drafted a form letter than he provided to members to explain to their employers that they could not work on the Sabbath. He put the form letter on his computer. He also gave Ms. Brown's mother and father signed letters for their employers. Mr. Faith testified that Ms. Brown's father had asked him for a letter explaining the Sabbath requirements for Ms. Brown's employer. During the course of the conversation, Ms. Brown's father expressed to Mr. Faith that he had a copy of the form letter and that he would modify it and give it to Ms. Brown. Mr. Faith testified that he did not authorize the use or modification of the letter; however, he also did not tell Ms. Brown's father than he could not use the letter. Mr. Faith was disturbed because he was no longer a member of the Church of God, International, as the form letter indicated. He would have written a new letter on Church of God, Sabbatarian letterhead, since that was the church he was affiliated with; however, Ms. Brown had never attended that church.
[3] Article 8.01 of the Collective Bargaining Agreement states that an employee is entitled to one personal holiday each contract year. The contract year runs from September 26th through September 25th of the following year. The Collective Bargaining Agreement also provides for vacation after one year of continuous service. Ms. Brown was not entitled to any vacation as of January 1999.
[4] Ms. Brown indicated in her charge for discrimination that she informed both the Line Leader (Ms. Minor) and the Staffing Coordinator (Ms. Winston) of her inability to work the Saturday shift. She did not say that she informed Mr. Ritchie; however, as Plaintiff points out, she also did not state that she did not speak with Mr. Ritchie. The EEOC investigator testified that during his investigation, he did not learn of any facts indicating that Ms. Brown spoke with Mr. Ritchie about the January 30, 1999 mandatory overtime until after her absence.
[5] Ms. Brown was not entitled to any vacation at that time, nor was she able to apply for a shift change under the provisions of the Collective Bargaining Agreement.
[6] Thursday was the fourth day of Ms. Brown's work week. Therefore, she was unable to notify Defendants of her inability to work by the third day of the week in order to only receive one point per hour missed. If she had been assessed only one point for every hour not worked, as allowed under the Collective Bargaining Agreement when an employee provides notice by the third day of the work week, she would not have exceeded the twenty-five point limit.
[7] The attendance policy has been varied in the past in response to grievances.
[8] Article 6.00 of the Collective Bargaining Agreement states that the company will not discriminate against any employee because of religion.
[9] The Court understands that the AAIM Management Association is a regional St. Louis organization that provides management training and information to its members.
[10] The Court notes that Ms. Brown was schedule to work mandatory Saturday overtime twice during her employment with Defendants. The first instance was February 14, 1998, and the second was January 30, 1999. There is no claim of religious discrimination based upon the first mandatory Saturday overtime scheduled for February 14, 1998, because no attendance points were assessed to Ms. Brown and her failure to work on February 14, 1998 therefore did not implicate an adverse employment action.
[11] Defendants do not dispute that any such belief is "religious."
[12] As noted above, there is no claim for religious discrimination based upon Ms. Brown's failure to work Saturday overtime on February 14, 1998; however, as of that time, Mr. Ritchie was generally aware of Ms. Brown's religious conflict.