Gary BROWN Plaintiff

v.

**ARKANSAS STATE HIGHWAY AND TRANSPORTATION DEPARTMENT Defendant**

No. CIV.03–2280.

United States District Court, W.D. Arkansas, Ft. Smith Division.

Dec. 10, 2004.

R.H. Hixson, Paris, AR, Kent Tester, Clinton, AR, for Plaintiff.

Barbara A. Batiste, Jacksonville, AR, David S. Long, Robert L. Wilson, for Defendant.

## MEMORANDUM OPINION AND ORDER

DAWSON, District Judge.

Plaintiff brings this action against his former employer, the Arkansas State Highway and Transportation Department (hereinafter "ASHTD"), alleging claims of a racially hostile work environment, disparate treatment, and constructive discharge under Title VII and 42 U.S.C. §§ 2000e to 2000e–17. Plaintiff also alleges violations of the Arkansas Civil Rights Act of 1993. Currently before the Court is Defendant's Motion for Summary Judgment. (Doc. 11.) As reflected below, Defendant's motion is GRANTED in part and DENIED in part.

### A. Background

The following facts are undisputed:

1. Plaintiff began working for ASHTD in the District Four Sealing Crew in Paris, Arkansas (hereinafter "the Paris yard"), in November 2001 as a Multi–Axle Truck Driver. (Doc. 20.)

2. As a Multi–Axle Truck Driver, Plaintiff's duties included: flagging traffic and performing manual labor cleanup duties; performing preventive maintenance servicing of assigned equipment; loading and unloading and stacking bagged salt, sand, and cement; and operating a tandem axle dump truck to haul highway construction materials, etc. (Doc. 12.)

3. During Plaintiff's employment, white coworkers spoke racial slurs about black people on four occasions. (Doc. 20.) None of these slurs were direct-

ed toward Plaintiff. (Doc. 12.) The four instances of racial slurs include the following:

a. At a safety meeting held by supervisor Pickens in March 2002, Supervisor Pickens asked whether anyone had heard any offensive remarks at the Paris yard. Plaintiff's minority coworker, Eric Fannon, complained about another worker who, upon seeing some spotted sheep on the side of the road, remarked that it looked like "some niggers been breeding them sheeps." (Doc. 13 ¶ 2 and Doc. 19 p. 2.)

b. In May 2002, Plaintiff overheard another coworker, Henry Jackson, tell Supervisor Pickens a racially offensive joke about how "[w]oman had to be made from a white man, because you can't take a rib from a black man." In response to the comment, Supervisor Pickens gave Jackson a written "Documentation of Performance Requiring Improvement." (Doc. 18 Ex. B and Doc. 19.)

c. In August 2002, Plaintiff overheard a conversation between his supervisor, Mike Pickens, and another employee discussing the work of the "five niggers," which was understood to be a reference to five white workers who were standing on the side of the road and not working. (Doc. 1 ¶ 9.)

d. Later in August 2002, Plaintiff was working with two white coworkers when one yelled to the other in Plaintiff's presence, "I ain't your nigger." (Doc. 13.)

4. In October 2002, Plaintiff competed against a white employee for the position of "Backhoe/Front End Loader Operator." He was interviewed but not selected. (Doc. 12 Ex. C p. 3.) Plaintiff's application for the position does not reflect any experience with the backhoe, and the employee selected, Donald Mizzell, reported some experience with the machine. (Doc. 12 Ex. C p. 4–6.)

5. In November 2002, Plaintiff's coworkers voted on which worker in the crew should receive the annual merit raise. Plaintiff received the same number of votes as a white fellow coworker, Paul Forst. (Docs. 1 and 12.) Instead of going to either of these two, the raise went to another white coworker, Johnny Carte. (Doc. 20.)

6. Paul Forst was denied the merit raise because he had damaged an ASHTD vehicle, and Plaintiff was denied the merit raise "for receiving counseling for insubordination." (Doc. 12 Ex. C; Cole Aff. ¶ 4.)

7. On December 10, 2002, Plaintiff and minority coworkers Paul Cooper and Eric Fannon were assigned to an operation involving a brush chipper. None of the aforementioned were wearing safety vests or safety glasses. (Doc. 19; Cooper Stmnt. p. 28.) The three individuals verbally protested Supervisor Pickens' admonition to wear the vests and glasses, and during a follow-up meeting to discuss the incident, Plaintiff refused to leave the private meeting between Cooper and Supervisor Pickens when asked to do so. Plaintiff, Cooper and Fannon were reprimanded for insubordination. (Doc. 18 Ex. B. p. 3.)

8. In February 2003, a worker put unneeded oil in a truck that Plaintiff usually drove and indicated that Plaintiff put the oil in the truck. The oil overfilling caused the truck to leak oil, but Plaintiff was not cited for the incident. (Doc. 1 ¶¶ 14–15 and Doc. 13 p. 3.)

9. After the oil incident, Plaintiff demanded and received a meeting with Supervisor Pickens' boss, Harold Beaver, Regional Director in Fort Smith, Arkansas. (Doc. 1 ¶ 16.) Plaintiff alleges, and Defendant denies, Beaver told Plaintiff during the meeting that Supervisor Pickens was Beaver's "boy," and that Beaver had fired people in the past for "documenting things." (Doc. 1 ¶ 17.) Defendant claims Beaver provided Plaintiff with forms for filing a grievance against ASHTD. (Doc. 18 Ex. B p. 2.)

10. On March 3, 2003, Internal EEO Coordinator Wanda Ashley conducted a Discrimination Complaint Review. Ashley's review culminated in a report reflecting interviews, observations, and statements of ASHTD Paris yard employees. (Doc. 18 Ex. B.)

11. In April 2003, Plaintiff reported to police and ASHTD that his car was "keyed," or scratched by use of an automobile key or other metal object, while on the ASHTD premises. The culprit was not identified. (Doc. 13 p. 3.)

12. Once, when Plaintiff's air conditioned, automatic transmission work vehicle was hit and damaged by a white dump truck driver, Plaintiff was switched to a standard transmission, non-air conditioned truck, and the white dump truck driver was given Plaintiff's air conditioned, automatic transmission vehicle to drive when it was placed back into service. (Doc. 19 ¶ 11.)

13. On one occasion, Plaintiff was asked to shovel sand from bridges and perform tasks while wading in water. Plaintiff performed these tasks while wading in water along with other white coworkers. (Doc. 12 Ex. B; Brown Depo. pp. 73–75.)

14. On May 3, 2003, the Paris yard of the ASHTD held diversity training in order to train the crew on appropriate actions and reactions to diversity issues in the workplace. (Doc. 19 p. 6.)

15. Plaintiff and Paul Cooper were the only African–American employees in District 4 of the ASHTD from November 2001 to July 2003. (Doc. 20.)

16. Plaintiff terminated his employment with the ASHTD in July 2003. (Doc. 12 ¶ 11.) He told employees at ASHTD he was looking for another job hauling trash. (Doc. 12 Ex. B; Brown Depo. p. 91–92.)

17. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") on September 4, 2003. (Doc. 1.)

18. Paul Cooper also initiated suit against ASHTD in this Court, and that matter has concluded.

## B. DISCUSSION

■ Defendant moves for summary judgment on Plaintiff's constructive discharge claim under Title VII, 42 U.S.C. §§ 2000e to 2000e–17, and the Arkansas Civil Rights Act of 1993, and on Plaintiff's claim of a racially hostile working environment. Since "[c]laims premised under the Arkansas Civil Rights Act of 1993 are analyzed in the same manner as Title VII claims," *see Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 615 n. 3 (8th Cir.2000), the analysis under Title VII provides the standard to be followed in this case as to both the state and federal claims of discrimination.

In determining whether summary judgment is appropriate, the Court must view the facts and inferences in the light most favorable to the non-moving party. *See Rabushka v. Crane Co.*, 122 F.3d 559, 562 (8th Cir.1997). The moving party bears the burden of establishing the absence of issues of material fact in the record and of

establishing that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If a plaintiff fails to make a showing sufficient to establish the existence of an element essential to his case and on which he will bear the burden of proof at trial, then the moving party is entitled to summary judgment. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

### 1. Hostile Work Environment Claim

 Plaintiff contends he was subjected to a hostile work environment on the basis of his race. To establish a hostile work environment claim, a plaintiff must show that he was a member of a protected class, that he was subjected to unwelcome harassment, that the harassment resulted from his membership in the group, and that the harassment affected a term, condition, or privilege of his employment. *See Jackson v. Flint Ink North Am. Corp.,* 370 F.3d 791, 793 (8th Cir.2004). Unless the alleged harassment was perpetrated by supervisors, a plaintiff must also demonstrate that the defendant knew or should have known about the harassment, but failed to take proper remedial measures. *See id.*

 In this case, there is no dispute Plaintiff is African–American and is a member of a protected class. To be actionable under Title VII, however, the "work environment must have been 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.' " *Id.* (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). Courts look "at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Moreover, the alleged discriminatory actions must be "so severe or pervasive as to alter the conditions of [the plaintiff's] employment." *Jackson,* 370 F.3d at 793 (citing *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)). Whether the harassment created a hostile environment is a function of both the severity and pervasiveness of the offensive conduct, with a high level of severity compensating for a low level of pervasiveness and vice versa. *See Jackson,* 370 F.3d at 794.

Plaintiff alleges four incidents of racial slurs. First, in August 2002, Plaintiff claims he overheard a white coworker speaking to Supervisor Pickens and referring to five white coworkers as "five niggers." (Doc. 1 ¶ 9.) Second, later in August 2002, Plaintiff claims he was working among two white coworkers when one yelled to the other in Plaintiff's presence "I ain't your nigger." (Doc. 13.) Third, in March 2002, Plaintiff claims a minority coworker reported to Supervisor Pickens during a safety meeting that he overheard the comment from a white coworker about some spotted sheep that it looked like "some niggers been breeding them sheeps." (Doc. 13 ¶ 2 and Doc. 19 p. 2.) Fourth, Plaintiff claims he overheard a white coworker tell Supervisor Pickens a joke about it being impossible to take a rib from a black man. (Doc. 19.)

 Plaintiff reported these four incidents as racial slurs, and it is clear they were offensive to him. Whether the remarks were objectively offensive (i.e. remarks that a reasonable person would find hostile or abusive) is another matter. Even viewing the alleged offensive comments as true and in the light most favor-

able to Plaintiff, the Court determines the alleged remarks, although inappropriate, were infrequent, isolated, and offhand remarks not specifically directed at Plaintiff. *See, e.g., Griffith v. City of Des Moines,* 387 F.3d 733 (8th Cir.2004) (holding three isolated incidents of racial slurs not directed at plaintiff do not create a hostile environment). Further, these remarks do not show a "steady barrage of opprobrious racial comment." *Jackson,* 370 F.3d at 795 (citing *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir.1981) (holding racial comments that are merely part of casual conversation or are sporadic do not trigger Title VII's sanctions)).

In Plaintiff's brief, he argues the incidents owing to the racially hostile working environment are far broader than the racial slurs. Plaintiff relies on the testimony of Paul Cooper, a black coworker who began working in the Paris yard several years before Plaintiff. (Doc. 18 Ex. A; Cooper Aff. ¶ 1.) Specifically, Plaintiff claims he was aware of Paul Cooper's exposure to mistreatment and that these occurrences add to the pervasiveness asserted in Plaintiff's hostile environment claim. (Doc. 12 Ex. B; Brown Dep. p. 12.) Despite his knowledge of these incidents, Plaintiff cannot show any such instances that were "so severe or pervasive as to alter the conditions of [Plaintiff's] employment." *Jackson,* 370 F.3d at 793.

■■■ Even if Plaintiff had proved the primary elements for a hostile work environment, there is an additional burden he has not met. Unless the alleged harassment or discrimination was perpetrated by supervisors, Title VII requires Plaintiff to show the Defendant knew or should have known about the harassment, but failed to take proper remedial measures. *See Jackson,* 370 F.3d at 793. In our instant case, Supervisor Pickens was not the source of racially discriminatory activity. Additionally, the facts reflect Plaintiff officially reported the alleged discrimination, or harassment, for the first time when he met with Harold Beaver, ASHTD's Regional Director in Fort Smith, who Defendant claims instructed Plaintiff on how to file a grievance. (Doc. 18 Ex. B pp. 1–2.) Once Plaintiff filed an official grievance, the undisputed facts show Defendant launched an internal investigation, and in response to the investigation's findings, Defendant held diversity training in order to train the crew on appropriate actions and reactions to diversity issues in the workplace. (Doc. 18 Ex. C and Doc. 19 p. 6.)

Thus, the Court finds with respect to the alleged racial slurs Plaintiff has not produced evidence of harassment so extreme as to change the terms or conditions of Plaintiff's employment. *See Faragher,* 524 U.S. at 788, 118 S.Ct. 2275. Further, Plaintiff has not shown Defendant failed to take steps to remedy any racial discrimination or harassment in the workplace. Accordingly, Defendant is entitled to summary judgment on Plaintiff's hostile environment claim.

### 2. Constructive Discharge Claim

■■■ The Plaintiff also claims he was a victim of constructive discharge. In order to prove constructive discharge, the employer's actions leading up to the employee's resignation "must have been taken with the intention of forcing the employee to quit." *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981); *see also Duncan v. General Motors Corp.,* 300 F.3d 928, 935 (8th Cir.2002). A constructive discharge arises only when a reasonable person would find the conditions of employment intolerable. *See Summit v. S–B Power Tool,* 121 F.3d 416, 421 (8th Cir.1997). In the absence of the employer's conscious intent, the intent element may be proved by a plaintiff showing his "resignation was a reasonably foreseeable

consequence" of the racially hostile atmosphere of his workplace. *Hukkanen v. Int'l Union of Operating Eng'rs Local 101,* 3 F.3d 281, 285 (8th Cir.1993).

Although Plaintiff claims "[p]oor treatment continued for the Plaintiff culminating in Plaintiff's termination of his own employment" (Doc. 1 ¶ 21), he does not allege Defendant or its agents forced him to resign. Thus, the only way Plaintiff can demonstrate constructive discharge is by showing his resignation was a reasonably foreseeable consequence of the racially hostile atmosphere of his workplace. Since the Court has determined Plaintiff failed to prove a racially hostile work environment existed, the Court determines Plaintiff's constructive discharge claim also must fail. Accordingly, Defendant is entitled to summary judgment on Plaintiff's constructive discharge claim.

### 3. Disparate Treatment Claim

Plaintiff also contends Defendant, by and through its agents, treated him differently than his white coworkers in violation of Title VII and the Arkansas Civil Rights Act of 1993.

To establish a *prima facie* case of race discrimination under Title VII, a plaintiff must show that he "1) was a member of a protected group, 2) was meeting the legitimate expectations of [his] employer, 3) suffered an adverse employment action, and 4) that similarly situated employees, who are not members of the protected group were treated differently." *Clark v. Runyon,* 218 F.3d 915, 918 (8th Cir.2000); *see also Austin v. Minnesota Min. and Mfg. Co.,* 193 F.3d 992, 994–95 (8th Cir.1999). Once the plaintiff has established a *prima facie* case of race discrimination, the burden of production shifts to the employer to identify a legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36

L.Ed.2d 668 (1973). Once fulfilled, the burden of persuasion then shifts to the plaintiff to show the employer's stated reason was a pretext. *See id.* at 804, 93 S.Ct. 1817.

In our case, Defendant disputes only one aspect of Plaintiff's *prima facie* case. Defendant claims Plaintiff in all respects failed to show that similarly situated ASHTD employees at the Paris yard who were not black were treated differently than Plaintiff. (Doc. 13 p. 7–9.) We disagree.

Plaintiff presents for the Court's consideration two alleged discriminatory instances in support of his claim of disparate treatment under Title VII. First, Plaintiff argues he was discriminated against when DEFENDANT denied his application for the position of "Backhoe/Front End Loader Operator" in October 2002. (Doc. 20 ¶ 3.) Second, he argues he was discriminated against when Defendant denied him a merit raise that was instead given to a white coworker in November 2002. (Doc. 20 ¶ 5.)

### a. Defendant's Failure to Promote Plaintiff to the Backhoe Operator's Position

In October 2002, Plaintiff competed against a white coworker, Donald Mizell, for a position as a "Backhoe/Front End Loader Operator." (Doc. 12 Ex. C p. 3.) Plaintiff claimed Mizell "came in, I think two months after I did" and had less experience than Plaintiff. (Doc. 12 Ex. B; Brown Dep. p. 80.) Defendant averred, however, Plaintiff was denied the position since the other applicant had worked at the Paris yard longer than Plaintiff. Additionally, Defendant noted the white applicant had some work experience at operating a backhoe whereas Plaintiff had none. Defendant's version of these facts is corroborated by Plaintiff's and Donald Mi-

zell's applications for the position as well as the Affidavit of Crystal Cole, ASHTD's Division Head for. Human Resources. (Doc. 12 Ex. C; Cole Aff. ¶ 5.)

In view of the fact that Plaintiff had less experience and lacked seniority on the job site, the Court concludes Plaintiff was not similarly situated to his white coworker who received the backhoe operator's position. Accordingly, with respect to the backhoe operator's position, the Court can only conclude Plaintiff has failed to satisfy his burden of proving a *prima facie* case of race discrimination. Even if Plaintiff had satisfied its burden, however, the Court could not say Defendant's decision to hire a more experienced applicant for a promotion was pretextual, illegitimate, or unlawful. Defendant is therefore entitled to summary judgment on Plaintiff's disparate treatment claim regarding the denial of the backhoe operator's position.

### b. Defendant's Failure to Award Plaintiff a Merit Raise

■ Defendant's failure to award Plaintiff the merit raise presents a matter of greater concern. It is undisputed that the workers in the Paris yard took a vote in November 2002 in order to determine who should receive a merit raise for 2003 and that Plaintiff and Paul Forst tied for the most votes. (Docs. 1 and 12.) Further, Plaintiff alleges the raise went instead to a white coworker named Johnny Carte. (Doc. 20.) In its brief, Defendant does not dispute the fact that Plaintiff and Johnny Carte, were similarly situated, however Defendant argues Plaintiff was not treated differently. (Doc. 13 p. 8.) Due to the fact that Johnny Carte, a similarly situated white coworker, received the merit raise instead of Plaintiff, the Court de-termines Plaintiff has demonstrated he was treated differently than his similarly situated white coworkers. Accordingly, the Court concludes Plaintiff has properly established a *prima facie* case of racial discrimination with respect to the merit raise.

■ The next stage of the analysis involves Defendant's reasons for denying Plaintiff the merit raise. Such reasons must be legitimate and not merely a pretext for race discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 804, 93 S.Ct. 1817. In explaining the denial of the merit raise, Defendant claimed it denied the raise to Paul Forst because he had damaged an ASHTD vehicle, and Plaintiff was denied "for receiving counseling for insubordination." (Doc. 12 Ex. C; Cole Aff. ¶ 4.) Plaintiff argues, however, Defendant's stated reason is a pretext for discrimination on the basis of race.

■ Although insubordination may be a legitimate reason for an adverse employment action such as denial of a raise, *see, e.g., Putman v. Unity Health System,* 348 F.3d 732, 736 (8th Cir.2003) (holding insubordination and violation of company policy are legitimate reasons for termination), the record lacks any indication that Plaintiff was cited for insubordination prior to his denial of the merit raise in November 2002. Rather, the only mention of Plaintiff's insubordination in the record occurred in December 2002, the month *following* Plaintiff's denial of the raise.[1] Neither Plaintiff nor Defendant provide the Court with any affidavits, statements, or deposition excerpts from either Supervisor Pickens or Regional Director Beaver that may help clarify this point. As a result, the Court can only find that there is a

---

1. On approximately December 10, 2002, Plaintiff and minority coworkers Paul Cooper and Eric Fannon were cited for insubordination by Supervisor Pickens after arguing with him about the wearing of safety goggles and safety vests while operating a chipping machine. (Doc. 18 Ex. B. p. 3.)

genuine issue of material fact as to whether Defendant's stated reason for not selecting Plaintiff for the merit raise was pretextual. Accordingly, Defendant's Motion for Summary Judgment (Doc. 11) as to Plaintiff's claim of disparate treatment based on the denial of a merit raise is DENIED.

## C. CONCLUSION

Based on the foregoing, the Court determines summary judgment is GRANTED in favor of Defendant on Plaintiff's claim of a hostile environment and constructive discharge under Title VII and the Arkansas Civil Rights Act of 1993. As to Plaintiff's claims of disparate treatment under Title VII and the Arkansas Civil Rights Act of 1993, summary judgment is GRANTED as to Plaintiff's claim of disparate treatment regarding Defendant's failure to grant him a position as a backhoe operator, however summary judgment is DENIED as to Plaintiff's claim of disparate treatment regarding Defendant's failure to grant him a merit raise. Accordingly, Plaintiff's claim of disparate treatment regarding the merit raise shall proceed to a trial currently scheduled for January 24, 2005.